[No. G022836. Fourth Dist., Div. Three. Sept. 27, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR VINCENT ANDREWS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976(c)(1), the introductory paragraph, part I, part II and the last sentence of the opinion are certified for publication.

COUNSEL

Mark Hammond, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.**—Victor Vincent Andrews was found guilty of threatening a public official, attempting to extort money and five counts of making annoying telephone calls. On appeal he maintains the evidence was insufficient to support some of his convictions, the prosecutor committed prejudicial misconduct and the trial court made two instructional errors. We are unpersuaded by his arguments and affirm.

### I

Andrews filed a workers' compensation action against his employer and its insurance company, CIGNA. In 1995, he represented himself during the

three-day trial. Judge Christine Nelson ruled in favor of Andrews's employer and CIGNA.

While Andrews's appeal was pending, he repeatedly attempted to contact his employer's attorney, Steve McNamara. His recorded voice mail messages, letters and statements to a private investigator are the basis of the charged offenses. They are as follows.:

August 16, 1996—Andrews left a voice mail message stating he was considering filing a lawsuit against those involved in the workers' compensation lawsuit. He said his civil rights had been violated and a "hate crime" had been committed against him. Andrews wanted McNamara to, "advise your people" he would file the lawsuit in a few weeks.

March 4, 1997—Andrews left a voice mail message saying if a civil lawsuit "doesn't work maybe a criminal trial will work. Whatever is necessary I will never give up. I will never give up Steve, never."

March 17, 1997—In another voice mail message, Andrews said he had proof McNamara, Judge Nelson and others had conspired against him. Once again, he warned McNamara he would file a lawsuit unless they agreed to settle his case. He told McNamara he would expose the conspiracy in the Los Angeles Times and on the television news show *Sixty Minutes*. Andrews threatened to "destroy the lives of everybody . . . involved in this conspiracy, everybody."

March 19, 1997—Andrews left four voice mail messages. First, Andrews accused Judge Nelson of taking bribes from attorneys and insurance companies. He claimed, "If I am involved in a criminal trial[,] I [will be] able to prove [the bribes occurred] and destroy all you guys." In the second message, Andrews asserted, "If I have a jury trial, . . . I will never be convicted because you are . . . all . . . mother-fuckers, the top of the mother-fuckers," and "you are asking for fucking problems." Finally, Andrews in his last two recordings said he would sacrifice his life if necessary for his cause and reiterated he may be forced to participate in a criminal trial and "bring in all the dirt."

The following month, McNamara received a letter, dated April 2, from Andrews. Although Andrews's appeal of Judge Nelson's ruling had been denied, he told McNamara, "I am willing to settle the case for the symbolic sum of $50,000. In addition, you must pay all the liens on my workers' compensation case. This will buy peace for everyone who is involved in the violation of civil rights, human rights, conspiracy and possibly hate crime[s].

If you do not respond to my letter in 14 days, I will understand this is my green light to initiate the process to punish with my blood on their hands." McNamara gave the letter to the police and Judge Nelson. CIGNA hired an investigator, Kevin Barsumian, to follow and watch Andrews.

April 16, 1997—Andrews noticed Barsumian was watching him and learned who he was. Andrews then told Barsumian he knew Judge Nelson had accepted bribes during his workers' compensation case and said he was "going to kill the mother-fucker." He claimed he could "get the judge" without being caught and bragged he could "blow[] out the doors and windows" of the workers' compensation building. He explained this plan would require the help of someone else and that he did not want to do it on a weekend. Andrews told Barsumian, "at the very least he would throw a bucket of red paint on [Judge Nelson] while she was in her chambers." Andrews also asserted he was going to tell the FBI and the Attorney General about Judge Nelson's misconduct.

On the same day, Andrews left several messages for McNamara. In the first one, he said he had met three investigators who were following him and had almost killed one of them. He claimed he "could kill 'em with a car, you know, I don't have to kill 'em with a gun you know." Next, Andrews spoke with McNamara's clerk, saying they should not worry about the investigators' safety because he was "not out to hurt them."

Andrews called McNamara three more times that day. In two voice mail messages he predicted, "so many lives will be destroyed" and "when the shit hit[s] the fan . . . I will not be able to stop it." In his final voice mail message, Andrews said he would not harm McNamara "but the fucking prostitute fucking bitch [Judge] Nelson, oh yeah. I have plenty of shit against the mother-fucking prostitute. I wouldn't do any harm to you. Don't worry about it. I love your face, this is enough to spare you, but this fucking prostitute, [Judge] Nelson, I don't know, you know. I will go through the process but if I fail, if I don't find any understanding, I will eliminate and we'll probably meet in fucking heaven."[1]

Believing Judge Nelson was in danger, McNamara notified her about the voice mail messages and the investigator's conversation with Andrews. The police subsequently arrested Andrews.

---

[1]With reluctance we repeat word for word Andrews's offensive statements. His repeated use of the same vulgar epithet makes this opinion read like a sleazy bad movie script.

We are reminded of a great quotation, authored by Justice Gardner in *People* v. *Benton* (1978) 77 Cal.App.3d 322 [142 Cal.Rptr. 545]. There the defendant, before a robbery, told his victim "Don't say a word, don't say a mother-fucking word." Justice Gardner noted, "It is a sad commentary on contemporary culture to compare, 'Don't say a word, don't say a mother-fucking word' with 'Stand and deliver,' the famous salutation of Dick Turpin and other early English highwaymen. It is true that both salutations lead to robbery. However,

At trial, Andrews testified his statements had been misunderstood. He explained he is a Polish immigrant and sometimes has trouble communicating in English. He says he often has problems finding the right English words to say, especially when he is excited.

## II

Andrews claims the evidence was insufficient to support his conviction for threatening a public official in violation of Penal Code section 76 because the prosecution failed to prove his threats caused Judge Nelson to fear for her safety.[2] The Attorney General maintains section 76 should not be interpreted to require such a mental state on the part of the victim. Neither we nor the parties have found any authority directly addressing this issue.

"We apply the following established principles in construing the subject statute. The ' "fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. . . ." . . . In determining this intent, courts look first to the words contained in the statute, giving them their usual and ordinary meaning.' " (*People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1236 [44 Cal.Rptr.2d 328], citations omitted.)

Section 76, subdivision (a) states, "Every person who knowingly and willingly threatens the life of, or threatens serious bodily harm to, any . . . judge, . . . with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means, is guilty of a public offense . . . ." Subdivision (c)(5) defines "threat" as "a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat *so as to cause the person who is the target of the threat to reasonably fear for his or her safety* or the safety of his or her immediate family." (Italics added.)

The Attorney General asserts the only "logical interpretation of this language is that the person making the threat does so with the intent to cause the target to reasonably fear for his safety, not that the target actually be in such fear." To agree with this conclusion, however, we would have to ignore the above italicized portion of the definition. It clearly states the threat must be made in a manner *"so as to cause"* the victim to be afraid. (§ 76, subd. (c)(5), italics added.) We must presume "the Legislature meant what it said

---

there is a certain rich style to 'Stand and deliver.' On the other hand, 'Don't say a word, don't say a mother-fucking word' conveys only dismal vulgarity." (*Id.* at p. 324, fn. 1.)

[2]All further statutory references are to the Penal Code unless otherwise indicated.

and the plain meaning of the statute governs. [Citations.]" (*People* v. *Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].)

Moreover, we have reviewed the pertinent legislative history and discovered the legislators modeled the language found in section 76, subdivision (c)(5) after "the definition of 'threat' currently in Penal Code section 646.9 regarding stalking."[3] (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1463 (1993-1994 Reg. Sess.) as amended Apr. 7, 1994; Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1463 (1993-1994 Reg. Sess.).) The stalking statute requires that "quite apart from the perpetrator's *intent* to induce fear, the *victim must actually fear* death or great bodily injury and that fear must be reasonable." (*People* v. *Carron, supra,* 37 Cal.App.4th at p. 1238, second italics added; see also *People* v. *Falck* (1997) 52 Cal.App.4th 287, 299 [60 Cal.Rptr.2d 624].) Accordingly, we find the prosecution was required to prove the victim "reasonably feared for his or her safety."

However, our ruling is a hollow victory for Andrews because our review of the record shows there was sufficient evidence establishing Judge Nelson reasonably feared for her safety. Andrews maintains there was only one statement "that could conceivably be considered threatening," but it is too unclear and ambiguous "to instill the type of reasonable fear contemplated under" the statute. We find the record shows Andrews made several unequivocal specific threats to injure and kill Judge Nelson.

We first note there is no dispute Judge Nelson knew about Andrews's threats. Because McNamara feared for their safety, he provided the judge with transcripts of all the voice mail messages and told her about the investigator's distressing conversation with Andrews. Thus, the judge heard that Andrews wished to "destroy the lives of everybody" involved in his case. She knew he had made a disturbing promise to "initiate the process to punish with my blood on their hands." Although it is unclear what exactly Andrews intended to do, his message certainly conveyed violence and injury was involved.

Against this backdrop, the judge next learned Andrews had boasted to a private investigator he had a specific plan to "get the judge" by blowing up her workplace. Andrews threatened he was "going to kill the mother fucker."

---

[3]At the time, the stalking statute read in pertinent part, as follows, "For the purposes of this section, 'credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family." (Former § 646.9, subd. (e), repealed 1994, see now § 646.9, subd. (g).)

There was no reason for the judge not to believe such a serious life-threatening statement was real. Andrews also promised McNamara that he would not be harmed, but warned Judge Nelson would not be so lucky. As to her, he threatened "[I]f I don't find any understanding, I will eliminate and we'll probably meet in fucking heaven." The meaning of this threat was clear and unambiguous. Obviously Andrews and Judge Nelson could not meet in heaven unless they were both dead. Because it was plainly evident Andrews despised the judge and desired to harm her, the jury could rationally infer Judge Nelson reasonably feared for her safety.

## III-VIII*

. . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Crosby, J., and Bedsworth, J., concurred.

On October 27, 1999, the opinion was modified to read as printed above.

---

*See footnote, *ante*, page 1173.