[No. A114150. First Dist., Div. One. May 23, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN LEE BARRIOS, Defendant and Appellant.

**Counsel**

Karen W. Riley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Violet M. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**MARCHIANO, P. J.**—In separate proceedings, juries convicted defendant Kevin Lee Barrios of threatening a public official (Pen. Code, § 76, subd. (a)) and misdemeanor battery on a cohabitant (Pen. Code, § 243, subd. (e)(1)).

The trial court sentenced defendant to four years in prison for the threat and a concurrent six months for the domestic violence.

With regard to his conviction for threatening a public official, defendant primarily contends he could not be convicted unless he actually intended to carry out the threat, and the People failed to prove such an intent. With regard to his domestic violence conviction, defendant primarily contends the court erred by admitting the preliminary hearing testimony of the victim, who was unavailable for trial. As we explain below, we reject defendant's contentions and affirm both convictions.

## I. THE CONVICTION FOR THREATENING A PUBLIC OFFICIAL

### A. Facts

Defendant's conviction arises from his threatening his own defense attorney during his first trial on the domestic violence charge.

Attorney Marc Tirrell represented appellant in his first trial for inflicting corporal injury on a cohabitant. Tirrell worked for the Solano County Conflict Defender's Office. He had 26 years' experience as a criminal defense attorney. He had dealt with thousands of clients who had not always been pleasant to him. As he put it, "[y]ou must develop a thick skin to work in the Public Defender's Conflict Defender's Office. Because for whatever reason, you are often not liked by almost anyone. The clients, the clients' families, the public, sometimes the judges."[1] On one prior occasion, a defendant had threatened him to the extent that he feared for his safety, and he withdrew from the case.

On the morning of June 9, 2005, before the start of the second day of trial, Tirrell met with defendant in a holding cell in the courthouse. The room was only four feet by six or eight feet, and contained a table and two chairs that were not bolted down. Defendant was wearing belly chains attached to handcuffs, which limited the range of motion of his hands—but he had room to move his hands within the restraints. His legs were not restrained.

As Tirrell and defendant talked about how the trial was progressing, defendant became very upset with Tirrell. Defendant's facial expression changed, as did the volume and tone of his voice, and his body language. He became "a little bit flushed." Defendant was upset about the questions Tirrell had asked his former girlfriend, the victim, who testified the day before.

---

[1] Tirrell was quick to note that the trial judge in this case "is the exception."

Defendant told Tirrell "that when he got out of custody, he was going to kick my ass." At that point, Tirrell was "a little concerned," but defendant had made similar comments to Tirrell before. Tirrell described these comments as "general physical threats," but the pattern in the past was that defendant would become angry, make a threat, and then calm down when he and Tirrell continued to talk about the case. Thus, Tirrell was not concerned for his safety.

This time defendant did not follow the prior pattern. As Tirrell continued to talk to him, he stood up, his face became "extremely red . . . sort of contorted," his body was "very tensed," and "he looked at me and said that he was going to shoot me in the head with a bullet."

Tirrell felt "very threatened. I did feel that this was real, and I felt that it was serious." Tirrell reached that conclusion because the threat "was very specific. The way he said it; how he looked at me; his body language; his tone of voice; the color of his face; the fact that he stood up at that point." Tirrell felt "in fear for my safety." Tirrell felt that defendant would carry out the threat when he was released from custody.

Tirrell told defendant that their conversation was over, and got up and left the holding cell. He went up to Deputy Chase, a custodial officer who was outside, and told him he wanted to make a police report. Immediately after he left the room, Tirrell was "a little upset. Even being thick-skinned, I felt that the threat was real. And I felt that my safety might be in jeopardy."

On cross-examination by defense counsel, Tirrell admitted that he knew that defendant had attention deficit hyperactivity disorder (ADHD), that ADHD causes people to be easily distracted and suffer from poor impulse control, and that he had observed defendant having poor impulse control. On redirect, Tirrell testified he did not feel safer because he knew defendant had ADHD. On the contrary, knowing defendant had poor impulse control "caused me to have more concern when he made that specific threat to kill me."

Officer Chase testified that when Tirrell came out of the holding cell, he looked "scared." "His eyes were kind of wide open. . . . I would describe it as a deer in the headlights . . . he was extremely nervous." Chase went into the holding cell, and noticed that defendant was aggravated and angry, and "was mumbling things like, dumptruck, piece of shit. Stuff like that."

As a result of the threat, the domestic violence trial ended in a mistrial.

## B. Discussion

█ Penal Code section 76[2] criminalizes certain threats against various elected and appointed public officials and their staffs and immediate families. Subdivision (a) of section 76 sets forth the elements of the offense. As here pertinent, subdivision (a) provides as follows: "Every person who knowingly and willingly threatens the life of, or threatens serious bodily harm to, any . . . county public defender . . . with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means, is guilty of a public offense . . . ."

Subdivision (c) of section 76 defines various terms. It defines "apparent ability to carry out that threat" as including "the ability to fulfill the threat at some future date when the person making the threat is an incarcerated prisoner with a stated release date." (§ 76, subd. (c)(1).)

Of more significance to the present case is the statute's definition of "threat." A threat "means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct *made with the intent* and the apparent ability *to carry out the threat* so as to cause the person who is the target of the threat to reasonably fear for his or her safety. . . ." (§ 76, subd. (c)(5), italics added.)

The trial court instructed the jury with Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 2650, which tracks the language of section 76. As here pertinent, the court instructed the jury as follows: "The defendant is charged with threatening a public official. To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant willingly threatened to kill or threatened to cause serious bodily harm to a conflict defender; two, when the defendant acted, he intended that his statement be taken as a threat; three, when the defendant acted, he knew that the person he threatened was a conflict defender; four, when the defendant acted, he had the apparent ability to carry out the threat; and five, the person threatened reasonably feared for his safety. [¶] . . . [¶] Someone who intends that the statement be understood as a threat does not have to actually intend to carry out the threat. . . ."

### 1. *CALCRIM No. 2650*

Defendant contends that CALCRIM No. 2650 is incorrect because it tells the jury that the defendant need not have the intent to carry out the threat, only the intent that the statement be taken as a threat. He argues that the

---

[2] Subsequent statutory citations are to the Penal Code unless otherwise indicated.

language of section 76, subdivision (c)(5) (section 76(c)(5)), which we italicized above, requires an intent to carry out the threat in order to convict under the statute. According to defendant, the language "made with the intent . . . to carry out the threat" requires the People to prove not only that he intended his comments and conduct in the holding cell to be *taken* as a threat, but also that he intended to *carry out* the threat.

The People respond by relying primarily on two cases which state that section 76 does not require an intent to carry out the threat: *People v. Gudger* (1994) 29 Cal.App.4th 310 [34 Cal.Rptr.2d 510] (*Gudger*) and *People v. Craig* (1998) 65 Cal.App.4th 1082 [83 Cal.Rptr.2d 1 (*Craig*). These cases are not helpful as authority on the precise question before us.

*Gudger* observed that "there is no requirement in section 76 of specific intent to execute the threat . . . ." (*Gudger, supra,* 29 Cal.App.4th at p. 320.) *Gudger* went on to hold that the intent that a statement be taken as a threat, coupled with the apparent ability to carry it out, satisfied First Amendment concerns of criminalizing speech. (*Gudger, supra,* at pp. 320–321; see discussion *id.* at pp. 316–320.) But *Gudger* was decided on October 18, 1994, *before* the effective date of the amendment to section 76 that added subdivision (c)(5). (Stats. 1994, ch. 820, § 1, p. 4071.) Thus, *Gudger* did not interpret the statutory language now before us.

The relevant issue in *Craig* was whether the threat had to be "present," as well as "immediate." (*Craig, supra,* 65 Cal.App.4th at pp. 1087–1092.) As part of its analysis leading to its conclusion that the threat need only be "immediate," the *Craig* court quoted a passage from *Gudger* which included the observation that section 76 requires no specific intent to carry out the threat. (*Craig, supra,* at pp. 1090–1091.) But *Craig* did not directly address or interpret the language of section 76(c)(5).

Thus, it appears we write on a clean slate. We disagree with defendant because we do not interpret section 76(c)(5) to impose a second intent requirement, but only a single one: the "specific intent that the statement is to be taken as a threat." That intent, coupled with the "apparent ability to carry out that threat by any means," is sufficient to constitute a violation of section 76.

"The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].)

Other courts refer to the "plain and commonsense meaning" of statutory language. (*People v. Cole* (2006) 38 Cal.4th 964, 975 [44 Cal.Rptr.3d 261, 135 P.3d 669] (*Cole*); see *People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

"We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory frame work as a whole." (*Cole, supra*, 38 Cal.4th at p. 975.)

Section 76, subdivision (a) lists the two elements of the crime of threatening a public official: "Every person who knowingly and willingly threatens the life of, or threatens serious bodily harm to, any . . . county public defender . . . [1] with the specific intent that the statement is to be taken as a threat, and [2] the apparent ability to carry out that threat by any means, is guilty of a public offense . . . ."

The focus of section 76 is not merely the intent of the person making the threat, but the effect of the threat on the victim. The actual emotional state of the victim is at issue. As section 76(c)(5) defines "threat," the threat has to be made in such a way "so as to cause the person who is the target of the threat to reasonably fear for his or her safety . . . ." Thus, the People must prove that the victim did in fact reasonably fear for his or her safety. (See *People v. Andrews* (1999) 75 Cal.App.4th 1173, 1177–1178 [89 Cal.Rptr.2d 683] (*Andrews*).)

Thus, the essence of a violation of section 76 is the making of a statement with the intent that it be taken as a threat, along with the apparent ability to carry out the threat, resulting in actual reasonable fear on the part of the victim. We see no reasonable way to interpret the statute to require an actual intent to carry out the threat. It is the fear that is instilled that is paramount. Indeed, the defendant need not have the *actual* ability to carry out the threat, only the *apparent* ability—and "apparent ability" includes "the ability to fulfill the threat at some future date when the person making the threat is an incarcerated prisoner with a stated release date." (§ 76, subd. (c)(1).) It is unreasonable to posit the need to prove an actual intent to execute the threat when the ability to do so can be attenuated by months, even years, before the release of the incarcerated threatener.

Our interpretation is supported by *People v. Carron* (1995) 37 Cal.App.4th 1230 [44 Cal.Rptr.2d 328] (*Carron*), a case interpreting the stalking statute,

section 646.9. The legislative history of section 76 shows that section 76(c)(5) was modeled after section 646.9, former subdivision (e). (See *Andrews, supra,* 75 Cal.App.4th at p. 1178 & fn. 3.) As it read in 1994, when section 76(c)(5) was enacted, section 646.9, former subdivision (e) defined "credible threat" in almost exactly the same language as used in section 76(c)(5). (*Ibid.*; see *Carron, supra,* at p. 1238.)

*Carron* rejected the identical argument now raised by defendant, i.e., that the language "made with the intent . . . to carry out the threat" requires the People to prove an intent to carry out the threat. The court noted that the stalking statute began by spelling out the elements of the offense, which included making a credible threat with the intent to place the victim in reasonable fear of death or great bodily injury. (*Carron, supra,* 37 Cal.App.4th at p. 1238 [discussing § 646.9, subd. (a)].) The court concluded that, when read in the context of the entire statute, the "intent" referred to in the former subdivision (e) threat definition was the "intent" set forth as the element of the crime—i.e., the intent to cause reasonable fear. (*Carron, supra,* at p. 1239.)

In the context of section 76, then, the language defining threat as a statement "made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety" would refer to the intent to make a threat, coupled with an apparent ability to carry it out, such as to cause reasonable fear. As the *Carron* court noted, it would be illogical to read into this language a requirement of an intent to carry out the threat, because such an intent "has no logical connection with 'to cause the person [who is the target of the threat] to reasonably fear for his or her safety.' " (*Carron, supra,* 37 Cal.App.4th at p. 1239.) In other words, the harm punished by section 76, the victim's fear, comes from the intent to make the threat and the apparent ability to carry it out—and not from any actual intent to do so.[3]

■ We conclude that CALCRIM No. 2650 correctly states the law. There is no error.

2. *Miscellaneous Issues Regarding the Threat to Tirrell**

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

---

[3] Defendant notes that the stalking statute was amended in 1995 to make explicit the lack of a requirement to intend to carry out the threat. (Stats. 1995, ch. 438, § 2, p. 3426.) He contends the Legislature's failure to make a similar amendment to section 76 is telling. We disagree. Section 76 is clear as it is written on the issue of the lack of intent to carry out the threat.

*See footnote, *ante,* page 270.

### 3. *The Evidence of ADHD*

 Defendant contends that his defense counsel at the threat trial, William Pendergast, introduced evidence of ADHD without defendant's consent. Defendant argues that he had a right to keep the evidence out because it involved his medical privacy. But the decisions on which he relies are distinguishable. And defense counsel is "captain of the ship" and may decide whether to present certain evidence as a matter of trial strategy. (See *People v. Murphy* (1972) 8 Cal.3d 349, 366 [105 Cal.Rptr. 138, 503 P.2d 594]; *People v. Turner* (1992) 7 Cal.App.4th 1214, 1220–1221 [10 Cal.Rptr.2d 358].)[4] Defendant's ADHD was a reasonable, viable component of his defense.

Defendant also contends that the trial judge inadequately responded to a note from the jury about ADHD. The jury sent the court a note asking for a definition of ADHD and whether defendant had been diagnosed with that condition. The judge wrote "no answer" on the note in response to both points. Defendant contends that under section 1138 the trial judge was obligated to respond to the jury's note orally in open court. But after the jury left the courtroom and began to deliberate, the judge announced his intended procedure in the event of a note from the jury—that he would confer with counsel and write an answer on the note. Defense counsel agreed on the record to this procedure. Thus, any error is waived.

The trial judge's use of a written communication to the jury, rather than an oral one, was not an abuse of discretion. (See *People v. Box* (2000) 23 Cal.4th 1153, 1213–1214 [99 Cal.Rptr.2d 69, 5 P.3d 130].) And even assuming the trial judge had a duty to define ADHD and respond to the jury's question about diagnosis, any error would be harmless. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) Tirrell testified that he knew defendant had ADHD and testified about the effect of ADHD on behavior, specifically defendant's.

## II. THE CONVICTION FOR DOMESTIC VIOLENCE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] Defendant has filed an in propria persona habeas corpus petition in which he appears to argue that Pendergast's tactical decision to admit the ADHD evidence was tantamount to entering a plea of guilty without defendant's permission, and thus amounted to the ineffective assistance of counsel. The petition is without merit. By a separate order filed this date, we deny the habeas corpus petition.

*See footnote, *ante*, page 270.

## III. DISPOSITION

The judgments of conviction are affirmed.

Stein, J., and Margulies, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 10, 2008, S164857.