[No. B232977. Second Dist., Div. Six. Jan. 10, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL AVILA, Defendant and Appellant.

## COUNSEL

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—We hold that an incarcerated defendant charged with threatening the life of or threatening serious bodily harm to an elected public official within the meaning of Penal Code section 76[1] need not have a "stated release date" to have the "apparent ability to carry out that threat."

Daniel Avila was convicted in a jury trial of six counts of making criminal threats (§ 422), and six counts of threatening elected public officials, here six deputy district attorneys (§ 76). The trial court sentenced appellant to prison for six years four months for the section 422 offenses. (§ 654.) It stayed identical terms for the section 76 offenses. The abstract of judgment also includes an order that appellant have "no contact with" the victims of his threats.

Appellant does not attack the section 422 convictions or the sentence imposed thereon. He does contend that he did not violate section 76 as a matter of law because he was incarcerated when he made the threats and did not have "a stated release date." This contention is without merit. He meritoriously contends the "no contact" order must be stricken because it was not imposed by the trial court at the sentencing hearing.

*Facts and Procedural History*

In February 2005, appellant was arrested for and charged with multiple counts of computer fraud and identity theft based on harassing text messages

---

[1] All statutory references are to the Penal Code unless otherwise stated.

he sent during his unsuccessful campaign for Thousand Oaks City Council. In connection with that case, appellant's computer was seized. A search of the computer revealed e-mails and diary entries advocating violence against named individuals and groups of people with certain political views.[2]

The deputy district attorney prosecuting the case against appellant, Leventhal, learned that appellant had left voice mails threatening a third person and his family. In March 2006, Leventhal requested that the trial court increase appellant's bail. The trial court granted the motion and appellant, unable to post bail, was taken into custody. At the time, appellant possessed a firearm.

Appellant elected to represent himself. He then persuaded his mother to help him make three-way telephone calls, in violation of jail policy. In July 2008, Leventhal filed a motion requesting that the trial court revoke appellant's right of self-representation based on these rule violations. While that motion was pending, appellant made a three-way call to a staff member in the district attorney's office. During the call, appellant told the staff member that he was getting tired of Leventhal harassing his mother. Appellant said that if the harassment did not stop, he would "deal with" Leventhal when he got out of jail. The next day, during a tape-recorded phone call with his mother, appellant said, "If . . . Leventhal keeps harassing my mother and keeps subpoenaing her, when I get out, I will—key word, will—I will attempt to murder him at his house, and I do know where he lives . . . . Uh, I will murder him. This is a threat with the specific intent that it be taken as such . . . ."

Leventhal listened to the recording and felt scared and threatened. He knew that appellant had been diagnosed as a paranoid schizophrenic and believed that he was dangerous. Although appellant was in custody when he made the threatening statements, Leventhal knew that he could be released at any time by posting bail or pleading guilty to the pending charges. Because appellant had already spent so much time in custody, guilty pleas would have resulted in his almost immediate release.

In September 2008, the trial court terminated appellant's right of self-representation based on his persistent violations of the rule against three-way calling and his ongoing mental health issues. The trial court appointed the public defender to represent appellant.

---

[2] After appellant was charged with the crimes which form the basis for the instant convictions and appeal, and after he served substantial custodial time, the trial court dismissed the charges relating to the original case over objection by the People. We affirmed the dismissal in an unpublished opinion (*People v. Avila* (Nov. 21, 2011, B229814)).

In December 2008, a deputy sheriff working at the county jail retrieved five envelopes that had been "wedged in the doorway up by the window area" of appellant's jail cell door. One envelope was stamped, addressed to Deputy District Attorney Suttner, and had appellant's name and booking number written on it. The deputy sheriff testified that appellant had written on the envelope itself, " 'When I get out, I will, quote, "find you," unquote, I will, quote, "will rape you," unquote, and I, quote, "will murder you," unquote, by stabbing you with a fishing knife and burning your body with a lighter fluid.' " On the other side of the envelope, appellant wrote, " 'This is a death threat to a deputy district attorney with the, quote, "specific intent," unquote, that you take it as such and to convey the gravity of purpose so you will remain in sustained fear for your life. You guys want to, quote, "falsely," unquote, call me a schizo, I'll start acting like one, quote, "immediately," unquote. [¶] I, quote, "challenge you," unquote, to file and consolidate a charge, bitch. Now this is what I call, quote, "substantial evidence," unquote, fuckers.' " The other four envelopes contained substantially similar messages and were addressed to other female deputy district attorneys.

The deputy sheriff had also retrieved other envelopes from appellant's cell door a few days earlier. One was addressed to the elected district attorney, Totten, " 'Satan,' " and included a threat to murder Superior Court Judge McGee. Appellant explained that he would shoot Judge McGee " 'with a shotgun at point-blank' " and then ignite " 'the natural gas main from the side of his house.' " Another was addressed to Deputy Public Defender Quest and also included a death threat. A third envelope was addressed to Deputy District Attorney Wold. Like the other envelopes, this one threatened to rape and murder the recipient and then to burn her body with lighter fluid. The deputy sheriff also discovered a fourth envelope, addressed to Deputy Public Defender Ellington and containing a threat to murder her.

In December 2008, appellant was charged with making criminal threats against his deputy public defender, Ellington. The trial court declared that Ellington had a conflict of interest, removed her as appellant's trial counsel and appointed new counsel to represent appellant. The new attorneys declared a doubt as to appellant's mental competency for trial. The trial court suspended all proceedings against appellant and appointed mental health professionals to examine him. At the subsequent competency hearing, the trial court found appellant incompetent to stand trial, suspended proceedings in all of the cases then pending against him and ordered appellant committed to Metropolitan State Hospital. We affirmed that order. (*People v. Avila* (2011) 191 Cal.App.4th 717 [119 Cal.Rptr.3d 657].)

Appellant continued to make threatening telephone calls while he was in the hospital. For example, in August and September 2009, Leventhal received

multiple threatening phone calls from appellant. In one of these calls, appellant ranted for over 45 minutes about Leventhal, making ethnic slurs, indicating he knew inmates who had been charged with conspiring to murder Leventhal, and talking about his plans to kill Leventhal when he was released from custody. In other calls, appellant mentioned the college Leventhal attended and a city where he had once lived. Appellant also found the home telephone number of a colleague of Leventhal's and called the colleague at home. In addition, appellant left threatening voice mails for other deputy district attorneys.

The deputy public defenders to whom appellant had addressed envelopes testified that they did not take the threats seriously and did not feel frightened by them. Appellant acknowledged that he had been upset with Leventhal when he called the prosecutor but denied threatening Leventhal with death. With the exception of the one he mailed to Deputy Public Defender Ellington, appellant claimed that he did not post any of the envelopes seized from his cell. The other envelopes were, he said, taken from a folder of privileged legal documents during a search.

Appellant testified he targeted female deputy district attorneys because he had heard that the women in that office were laughing at him and making fun of him. He wrote on the envelopes but did not intend to mail them. Appellant also acknowledged that he became more angry with the prosecutors and his defense counsel after the trial court, at Mr. Leventhal's request, declared him mentally incompetent. He did not like to be called a "schizo."

### Section 76 and a "Stated Release Date"

Appellant contends his convictions of having violated section 76 must be reversed because he was incarcerated with no release date when he made the threats. Section 76, subdivision (a) provides that it is unlawful for any person to "knowingly and willingly threaten[] the life of, or threaten[] serious bodily harm to, any elected public official . . . with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means . . . ." (§ 76, subd. (a).) Subdivision (c) of the statute provides, "For purposes of this section, the following definitions shall apply: [¶] (1) 'Apparent ability to carry out that threat' includes the ability to fulfill the threat at some future date when the person making the threat is an incarcerated prisoner with a stated release date." (§ 76, subd. (c)(1).)[3]

---

[3] A deputy district attorney is not separately set out as a victim of the section 76 offense, but he or she is a member of the "staff" of an elected public official. As such, the threat must relate directly to the official duties of the staff. (§ 76, subd. (d).) No such "relation to official duties" applies where the victim holds one of the offices separately set out in section 76, e.g., a judge.

■ We are not persuaded by appellant's contention that section 76 cannot, as a matter of law, be violated by an incarcerated person who does not have "a stated release date." The statute requires that the person making the threat have the "apparent ability to carry out the threat" by any means, not the *present* ability to carry out the threat personally or immediately. (*People v. Craig* (1998) 65 Cal.App.4th 1082, 1092 [77 Cal.Rptr.2d 272].) Whether a person has the apparent ability to carry out a threat "is a function of time and circumstances and thus a relative concept." (*People v. Gudger* (1994) 29 Cal.App.4th 310, 322, fn. 6 [34 Cal.Rptr.2d 510].) For example, where a person who has threatened to shoot a judge does not own a gun but could purchase one, "it would be reasonable to conclude [that person] had sufficient apparent ability to carry out the threat." (*Ibid.*) As the court held in *People v. Barrios* (2008) 163 Cal.App.4th 270 [77 Cal.Rptr.3d 456], "[T]he essence of a violation of section 76 is the making of a statement with the intent that it be taken as a threat, along with the apparent ability to carry out the threat, resulting in actual reasonable fear on the part of the victim. . . . It is the fear that is instilled that is paramount. Indeed, the defendant need not have the *actual* ability to carry out the threat, only the *apparent* ability . . . ." (*Id.* at p. 277, original italics.)

When appellant first made the threats against Leventhal in July 2008, he had been in custody, awaiting trial on the original computer fraud and identity theft charges, since March 2006. Leventhal testified that appellant remained in custody only because he did not post bail and refused to either plead guilty or start trial. In all likelihood, appellant would have been released immediately if he had posted bail or pled guilty.

Even if he had been convicted after a trial, appellant would have been released promptly because he had already been in custody for more than two years. The fact that he did not have a scheduled release date, therefore, was entirely within his own control. His victims, veteran prosecutors, well understood that appellant could be released from custody soon. They were actually and reasonably in a state of fear after receiving the threats. These facts show that appellant had the apparent ability to carry out his threats.

■ Appellant contends he was not capable of violating section 76 because he was incarcerated with no release date and subdivision (c)(1) provides that an incarcerated person has the apparent ability to carry out a threat only when that person has "a stated release date." (§ 76, subd. (c)(1).) We disagree. Subdivision (c)(1) provides that a prisoner with a stated release date may be included within the class of persons who have an apparent ability to carry out a threat. It does not state the reverse: that a prisoner *without* a stated release date cannot, as a matter of law, have the same ability.
■ Our fundamental task is to ascertain the intent of the Legislature so as to

effectuate the purpose of the statute. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) "We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].)

■ Subdivision (c)(1) of section 76 "includes" an incarcerated prisoner with a stated release date within the class of persons who are capable of violating section 76, but it does not limit the class of potential violators to those persons. "The term 'includes' is ordinarily a word of enlargement and not of limitation." (*People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723] [constitutional authorization to regulate common carriers extends to airlines where a related statute defines "common carrier" to "include" railroads and other transportation companies, even though statute did not mention airlines and was enacted before air travel existed]; see *In re M.W.* (2008) 169 Cal.App.4th 1, 5–6 [86 Cal.Rptr.3d 545] [statute requiring juvenile offender to make restitution for victim's economic losses includes types of losses not explicitly identified in statute].) Thus, where the term "recreational purpose" is defined to "include" several enumerated activities, it may be expanded to cover other activities. (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1100–1101 [17 Cal.Rptr.2d 594, 847 P.2d 560]; Civ. Code, § 846.) Similarly, a statute providing, " 'the word person includes a corporation as well as a natural person,' " also embraces noncorporate entities such as partnerships. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 716 [3 Cal.Rptr.3d 623, 74 P.3d 726]; see Civ. Code, §§ 14, 43.8.)

■ Here, a statute that "includes" an incarcerated person with a stated release date also extends to a prisoner who is not due for release where there is evidence that the prisoner nevertheless has the apparent ability to carry out a threat. For example, appellant's victims reasonably feared his ability to carry out his threats because, even though he did not have a stated release date, he could have secured his release at any time by pleading guilty. This is the functional equivalent of a release date and it satisfies the "apparent ability" element of the section 76 offense. Similarly, a pretrial detainee who does not have a "stated release date" might be able to secure his or her freedom by posting bail. As a consequence, that person could be said to have the "apparent ability to carry out [a] threat," even though he or she is incarcerated without a stated release date. The same could be said of a prisoner who is sentenced to death or life without possibility of parole. That person has no "stated release date," but might have a cohort outside of prison

who is willing to carry out threats on his or her behalf. Appellant's construction of section 76 would immunize all of these potential defendants from liability for criminal threats. We construe the statute to avoid this absurd result. (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1698 [8 Cal.Rptr.2d 614]; see *People v. Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 598 P.2d 473].)

■ We "apply reason, practicality, and common sense" to make the words of the statute "workable and reasonable." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298].) ■ The most reasonable construction of section 76 allows it to apply where, as here, substantial evidence establishes that an incarcerated person without a stated release date nevertheless has the apparent ability to carry out a threat. That ability could exist because the incarcerated person can promptly obtain his or her freedom by posting bail or by pleading guilty. It could also exist because the incarcerated person is known to have an accomplice acting on his or her behalf. In such cases, the apparent ability of the incarcerated defendant to place his or her victims in reasonable fear that a threat will be carried out should "trump" the procedural detail of whether corrections officials have given the defendant a release date.

We do not believe the Legislature intended a "stated release date" to be the sine qua non of section 76 liability where the defendant, though incarcerated, retains the apparent ability to make good on his or her threats by posting bail, pleading guilty or persuading an accomplice to do the dirty work. When an incarcerated person can exploit these or similar options, prosecution under section 76 should remain an available tool for law enforcement. This is the fair import of the requirement that the defendant have the "apparent ability to carry out that threat *by any means* . . . ." (§ 76, subd. (a), italics added.)

### "No Contact" Term

Although the probation report prepared for this matter included a recommendation that appellant be ordered to have no contact with his victims, the trial court did not impose a no contact order. Nevertheless, the minute order for the sentencing hearing includes a provision prohibiting appellant from having any direct or indirect contact with the deputy district attorneys he was convicted of having threatened. The abstract of judgment contains an identical "no contact" order.

Appellant contends and respondent concedes that the oral pronouncement of a sentence controls over a clerk's minute order (*People v. Farell* (2002) 28 Cal.4th 381, 385 [121 Cal.Rptr.2d 603, 48 P.3d 1155]) and that the no contact order must be stricken.

*Conclusion*

The superior court is directed to prepare a corrected minute order of the May 2, 2011 sentencing hearing, deleting the no contact term. The clerk of the superior court is further ordered to prepare and forward to the Department of Corrections and Rehabilitation a corrected abstract of judgment. In all other respects, the judgment is affirmed.

Gilbert, P. J., and Perren, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 17, 2013, S208755.