Filed 5/28/24  P. v. Laine CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>JOSHUA PHILLIP LAINE,<br><br>        Defendant and Appellant. | A164659<br><br>(Contra Costa County<br>Super. Ct. No. 5-191444-9) |

In July 2019, after an advocacy group posted a judge's home address on its Facebook page, defendant Joshua Laine posted a reply suggesting the judge's house should be burned down.  A jury convicted Laine of threatening a public official and criminal threats, both felonies, and he was sentenced to two years in prison.

On appeal, Laine raises two claims involving the requirement that where, as here, the threat is not directly communicated to the victim, the defendant must specifically intend that the threat be conveyed to the victim. Specifically, he argues that both convictions must be reversed because (1) there was insufficient evidence of the required intent and (2) the trial court failed to instruct the jury on this element.  The Attorney General concedes that prejudicial instructional error occurred, but he does not address Laine's challenge to the sufficiency of the evidence.

1

Even though we recognize that the threat was reprehensible and irresponsible, and understandably caused the judge to fear for her safety, we conclude there was no substantial evidence that Laine specifically intended for it to be conveyed to the judge. Thus, we reverse both convictions on this basis and do not reach the claim of instructional error. (See *People v. Wetle* (2019) 43 Cal.App.5th 375, 388.)

I.
FACTUAL AND PROCEDURAL
BACKGROUND

California Family Advocacy (CFA) is an organization aggrieved by the actions of courts and other agencies in family-law and dependency matters. It has conducted protests at courthouses and taken extremist positions, such as alleging that judges are "sex trafficking children" and selling their blood.

About a year before the charged crimes, CFA mounted an effort to recall three Contra Costa County superior court judges, one of whom was the Honorable Jill Fannin. Judge Fannin presided over family law cases from 2011 to 2014, and she also had a juvenile court assignment earlier in her career. The recall effort was ultimately unsuccessful because CFA failed to gather enough signatures.

CFA had a group Facebook page that was public, meaning a user did not have to be a member to view the page's posts. The page contained various doctored images of judges, including depictions of judges with pigs' features and behind bars. When Laine made the post at issue, the page had over 1,600 followers, who would be notified in their newsfeeds of the group's posts. It is unclear from the record whether Laine was a member of the page.

On the night of July 3, 2019, the CFA Facebook page made a post providing Judge Fannin's home address, where she lived with her husband, and a link to her house's listing on Zillow. The post also stated, "Maybe we

2

should provide residential address information on ALL #CPS judges." An hour later, around 10:30 p.m., Laine posted the following reply (the threat): "Did you know . . . prior to the 1930's, politicians/judges who violated the law or made their constituents unhappy got their houses burned down . . . . [¶] Just sayin." CFA's original post garnered at least 13 reactions ("likes or wows").

The following day, two other Contra Costa County judges notified a county sheriff's sergeant that Judge Fannin had been threatened on Facebook. Using a law-enforcement database, the sergeant was able to verify Laine was the one who posted the threat. Among other things, Laine's Facebook profile was in his true name, and it referred to his previous campaign for mayor of Livermore, where he lived.

When the sergeant contacted Laine, Laine stated he did not know whether he was a member of the CFA Facebook group or whether he posted the threat. He was familiar with CFA, but he thought its protests were "ridiculous." No evidence was presented that Laine was an official CFA member or was involved in any of their actions, including the attempt to recall Judge Fannin.

Eventually, Laine admitted he posted the threat, indicating "he could have been drunk" when he did so. He denied knowing Judge Fannin, and he attempted to "downplay" the threat as a statement of "historical fact." When the sergeant asked whether Laine was "looking to get some kind of reaction out of" the threat, Laine responded, "Probably not, no. . . . [T]hose protesting people I consider extremists. You know, that's not me. I don't want to spend time with that stuff."

One of the judges who reported the threat to the sheriff's sergeant informed Judge Fannin of it the same day. Judge Fannin then viewed the

3

CFA Facebook post and Laine's reply to it. Judge Fannin testified that she was already familiar with CFA's Facebook page, which she "would sometimes check . . . to see what was happening" with the effort to recall her. She remembered seeing Laine's "name a few times" before on webpages associated with CFA and the recall effort, but upon viewing the threat she realized that she had also seen his name on a lawsuit.

Specifically, Laine was a named plaintiff in a federal lawsuit against several defendants, including Alameda and Contra Costa County family-law judges, complaining about the plaintiffs' treatment in family court. The lawsuit was filed while CFA's effort to recall Judge Fannin was ongoing. Although Judge Fannin was not named as a defendant, the body of the complaint mentioned her multiple times in connection with a plaintiff other than Laine. The allegations specific to Laine involved his experiences in Alameda County family court, and Judge Fannin testified that as far as she knew, he never appeared before her. The federal lawsuit was ultimately dismissed.

When Judge Fannin viewed the threat, she became "really concerned" about her safety. Her fear was heightened because CFA's members were "irrational," making their behavior less predictable. She explained, "It's the 4th of July weekend. If you want to firebomb someone's house, that's probably the best time to do it. It seemed like [Laine] was inviting people, who . . . were[n't] all mentally sound[,] . . . to come to my house, to firebomb it on July 4th weekend, and this is a group who proudly says that they think I'm . . . sex trafficking children for money." When asked whether she perceived Laine's words as a threat, Judge Fannin responded, "A hundred percent."

4

As a result of the threat, Judge Fannin alerted her neighbors, and law enforcement was stationed by her house. It took several days for Facebook to remove CFA's post with her address, during which time Judge Fannin "obsessively" checked CFA's Facebook page to see whether it was still up.

Laine was charged with threatening a public official and criminal threats, and the jury convicted him of both counts.[1] The trial court denied probation and sentenced him to the midterm of two years in prison for criminal threats. A two-year term for threatening a public official was imposed and stayed.

II.
DISCUSSION

Laine contends that his convictions must be reversed because there was insufficient evidence that he specifically intended for his threat to be conveyed to Judge Fannin. We agree with the parties that this intent is a required element of convictions under both section 422 and section 76, and we conclude there was no substantial evidence that Laine harbored such an intent.

A. *Both Crimes Require a Specific Intent that the Threat Be Conveyed to the Victim.*

Under section 422, it is a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional,

_____

[1] Laine was convicted under Penal Code sections 76, subdivision (a) (threatening a public official), and 422, subdivision (a) (criminal threats). All further statutory references are to the Penal Code.

5

immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for [the person's] safety or for [the person's] immediate family's safety." (§ 422, subd. (a).)

The element of criminal threats at issue is the requirement that "the threat was made with the specific intent that it be taken as a threat." (*People v. Turner* (2020) 10 Cal.5th 786, 826; see § 422, subd. (a).) "Section 422 was not enacted to punish emotional outbursts[;] it targets only those who try to instill fear in others." (*People v. Felix* (2001) 92 Cal.App.4th 905, 913.) This does not mean "that a threat [must] be personally communicated to the victim by the person who makes the threat." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861 (*Ryan D.*); *In re David L.* (1991) 234 Cal.App.3d 1655, 1659 (*David L.*).) But if "the threat is conveyed through a third party intermediary," the defendant cannot have "intended the threat to be taken seriously by the victim" unless the defendant also "intended it to be conveyed." (*David L.*, at p. 1659.) Thus, where, as here, "the [defendant] did not personally communicate a threat to the victim, it must be shown that [the defendant] specifically intended that the threat be conveyed to the victim." (*Ryan D.*, at p. 861; *People v. Choi* (2021) 59 Cal.App.5th 753, 762.)

As relevant here, section 76, subdivision (a), makes it a crime to "knowingly and willingly threaten[] the life of, or threaten[] serious bodily harm to," various public officials, including judges, or their "immediate family, . . . with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means." Thus, similar to section 422, section 76 includes as an element that the defendant had " 'the specific intent that the statement . . . be taken as a threat.' " (*People v. Barrios* (2008) 163 Cal.App.4th 270, 277.)

6

Laine argues, and the Attorney General concedes, that based on the textual similarities between section 422 and section 76, the latter statute also requires a specific intent that the threat be conveyed to the victim. The question of whether the crime of threatening a public official includes this element is a question of statutory interpretation that we review de novo. (See *People v. Sanchez* (2019) 38 Cal.App.5th 907, 915.)

We accept the Attorney General's concession. Similar to section 422, section 76 does not require that the threat be made directly to the victim but does require a specific intent that the statement be taken as a threat. Thus, based on the same logic, a defendant who does not communicate the threat directly to the victim must intend that the threat be conveyed to the victim. (See *David L.*, *supra*, 234 Cal.App.3d at p. 1659.)

B. *There Is Insufficient Evidence that Laine Specifically Intended that the Threat Be Conveyed to Judge Fannin.*

When determining whether sufficient evidence supports a conviction, " 'an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] 'Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, "but our opinion that the circumstances also might reasonably be reconciled with a contrary finding" does not render the evidence insubstantial.' " (*People v. Davis* (2009) 46 Cal.4th 539, 606.)

We agree with Laine that he must have specifically *intended* that the threat be conveyed to Judge Fannin, not merely known it was possible she would learn of it. For example, *Ryan D.* held that insufficient evidence supported the finding that a juvenile committed criminal threats where he

7

gave his art teacher a painting of himself shooting a school police officer. (*Ryan D.*, *supra*, 100 Cal.App.4th at pp. 857–858.) Among other things, *Ryan D.* concluded there was no substantial evidence the juvenile intended to convey the threat to the officer. (*Id.* at pp. 863–864.) The court explained, "After completing the painting, the minor took it to class and turned it in for credit. This would be a rather unconventional and odd means of communicating a threat." (*Id.* at p. 863.) To be sure, "the minor could have, and perhaps even should have, foreseen the possibility that [the officer] would learn of and observe the painting," as in fact occurred once the art teacher reported the painting to the school administration. (*Id.* at pp. 858, 864.) Nonetheless, the foreseeability of the officer's seeing the painting was insufficient to establish that the juvenile specifically intended for the officer to do so. (*Id.* at p. 864.)

Other decisions reflect the same principle. For example, in *Felix*, the defendant was convicted of criminal threats after he indicated to his psychotherapist that he wished to kill his girlfriend. (*People v. Felix*, *supra*, 92 Cal.App.4th at p. 909.) Even though the psychotherapist had a duty to warn the intended victim, making it foreseeable she would learn of the threat, there was insufficient evidence that the defendant intended that the threat be communicated to her. (*Id.* at pp. 908, 913.) Similarly, in *People v. Roles* (2020) 44 Cal.App.5th 935, the appellate court reversed a conviction of criminal threats based on the defendant's threat to kill his wife's attorney in a family-law case. (*Id.* at pp. 938–939.) The defendant made the threat in a voicemail he left for his minor child's attorney. (*Id.* at pp. 939–940.) Even though the child's attorney communicated the threat to the wife's attorney, the defendant denied knowing that the two shared information, and there was no proof otherwise. (*Id.* at p. 944.) Without more, this was insufficient

8

to show that he intended the threat to be conveyed to the wife's attorney. (*Ibid.*)

As Laine points out, the CFA Facebook page "was an online community of people who shared a deep distrust of family law judges," and there is no basis to infer that he believed the page was "a conduit to communicate . . . to the very people [CFA was] ridiculing." (Italics omitted.) Thus, similar to the situation in *Ryan D.*, posting on CFA's page was an "odd means" of attempting to convey a threat to a judge. (*Ryan D.*, *supra*, 100 Cal.App.4th at p. 863.) And while it may have been foreseeable that Judge Fannin would learn of the threat, there was no evidence that Laine knew she monitored CFA's Facebook page or any other evidence from which to infer he intended to communicate the threat to her by posting it there.

Since the Attorney General did not respond to Laine's insufficient-evidence claim, we need not spend much time distinguishing the circumstances here from those in decisions holding there was substantial evidence of a specific intent that a threat be conveyed to the victim. Most of those decisions involved threats conveyed to a third party closely associated with the victim. (E.g., *People v. Choi*, *supra*, 59 Cal.App.5th at pp. 762–763 [threat conveyed to close friend of victims who was about to see victims]; *David L.*, *supra*, 234 Cal.App.3d at pp. 1657–1658 [minor communicated threat to victim's friend who was also present during incident that gave rise to threat].) Another decision, *In re A.G.* (2020) 58 Cal.App.5th 647, is closer to our facts in that it also involved a threat made on social media, but in that case there was also a close tie between the threat's recipients and the target who did not directly receive it. (See *id.* at pp. 656–657 [threat to bring gun to school was sent by Snapchat to several students, one of whom informed teacher].) Here, in contrast, there was no connection between the natural

9

audience of CFA's Facebook page and Judge Fannin such that it is reasonable to infer Laine intended for any of its members to convey his threat to her.

In short, there is no substantial evidence that Laine specifically intended to communicate the threat to Judge Fannin when he posted it on CFA's Facebook page.  Therefore, his convictions cannot stand.  We express no opinion on whether Laine could have been convicted of another crime for his irresponsible and harmful post.

### III.
#### DISPOSITION

The judgment is reversed.

_____

Humes, P. J.


WE CONCUR:



_____

Banke, J.




_____

Siggins, J.*




      *Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Laine*  A164659