Filed 4/8/16  P. v. Avila CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257654 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA410376) |
| v. | |
| DANIEL AVILA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed in part; reversed in part with directions.

Christine C. Shaver and David M. Thompson, under appointments by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael C. Keller, Jonathan J. Kline and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant, Daniel Avila, of 20 felony offenses, all of which he committed while in custody: 3 counts of attempted premeditated murder (Pen. Code,[1] §§ 664/182, subd. (a)) (counts 1, 2, 4); 8 counts of assault on a peace officer with a deadly weapon or by means likely to produce great bodily injury (§ 245, subd. (c)) (counts 5-12); 1 count of possessing a shank in jail (§ 4574, subd. (a)) (count 13); 1 count of battery on a peace officer by gassing (§ 243.9, subd. (a)) (count 14); 2 counts of battery upon a custodial officer (§ 243.1) (counts 16, 23); 1 count of resisting an executive officer (§ 69) (count 17); 3 counts of attempted criminal threats (§§ 664, 422, subd. (a)) (counts 18, 20, 24); and 1 count of attempting to threaten a public officer (§§ 664, 71, subd. (a)) (count 19). The jury further found defendant: personally used a deadly weapon, a shank, in the commission of the attempted murders and six of the aggravated assaults (§ 12022, subd. (b)(1)); inflicted great bodily injury on the victim in counts 2 and 6 (§ 12022.7, subd. (a)); and had 14 prior criminal threats convictions (§ 422, subd. (a)) within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b). Defendant was sentenced to 124 years to life in state prison plus 22 years.

Defendant argues it was a prejudicial abuse of discretion and a violation of his constitutional due process and fair trial rights to visibly restrain him during trial. Defendant further asserts there was insufficient evidence of attempted premeditated murder as charged in counts 1, 2 and 4. We modify the oral pronouncement of judgment to impose the Government Code section 70373, subdivision (a)(1) court facilities assessment *as to each count.* We modify the judgment to omit the section 12022, subdivision (b)(1) enhancements as to counts 7 and 9 because the jury found those allegations not true. We reverse the determinate sentences imposed as to counts 13, 14, 16, 17 and 23. Upon remittitur issuance, defendant is to be resentenced on the

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

determinate counts utilizing the principal and subordinate term methodology of section 1170.1, subdivision (a). We affirm the judgment in all other respects.

## II. THE EVIDENCE CONCERNING THE DECISION TO RESTRAIN DEFENDANT AND THE MERITS

### A. Defendant's History of Making Criminal Threats

The first argument raised by defendant is that he should not have been restrained during the trial. Thus, some of our recitation of the facts includes evidence considered by the trial court on that issue. At the time of the incidents at issue here, defendant was 6 feet, 4 inches tall and weighed at least 300 pounds. He had an extensive history of making death threats against prosecutors and defense attorneys. (See *People v. Avila* (June 10, 2014, B247954 [nonpub. opn.]; *People v. Avila* (2013) 212 Cal.App.4th 819; *People v. Avila* (2011) 191 Cal.App.4th 717; *People v. Avila* (Nov. 21, 2011, B229814) [nonpub. opn.].) We briefly outline that history. The chain of events began in February 2005 when defendant was charged in Ventura County Superior Court case No. 2005002781 with computer fraud and identity theft. (§§ 502, subd. (c)(1), 530.5, subd. (a); *People v. Avila, supra,* B229814, typed opn. at p. 2.) The prosecution alleged that in November 2004, during a campaign for a city council seat, defendant sent harassing text messages purportedly from a rival candidate. (*Ibid.*) These charges ultimately were dismissed. The dismissal was affirmed on appeal. (*People v. Avila, supra,* B229814, typed opn. at p. 5.)

While in custody awaiting trial in the fraud case, defendant repeatedly threatened to kill a Ventura County deputy district attorney, Marc Leventhal. (*People v. Avila, supra,* 212 Cal.App.4th at pp. 822-823; *People v. Avila, supra,* 191 Cal.App.4th at pp. 720-721.) On July 25, 2008, defendant was charged in Ventura County Superior Court case No. 2008030495 with making a criminal threat and threatening Mr. Leventhal. (§§ 422, 76, subd. (a).) Also on July 25, 2008, a deputy public defender was appointed to

represent defendant. On December 15, 2008, defendant, in writing, threatened to kill the deputy public defender. (*People v. Avila, supra,* 191 Cal.App.4th at p. 721.) Three days later, on December 18, 2008, defendant was charged in Ventura County Superior Court case No. 2008052740 with attempted criminal threat and threatening the deputy public defender. (§§ 664, 422, 76, subd. (a); see *People v. Avila, supra,* 191 Cal.App.4th at p. 722.) In Ventura County Superior Court case No. 2010010591, defendant was convicted of six counts of making criminal threats (§ 422) and six counts of threatening a public official (§ 76, subd. (a)). (*People v. Avila, supra,* 212 Cal.App.4th at p. 822.) The victims were six deputy district attorneys. (*People v. Avila, supra,* 212 Cal.App.4th at p. 822.) The judgment was affirmed on appeal. (*Id.* at p. 829.)

In Los Angeles Superior Court case No. BA366400, defendant was convicted of eight counts of making criminal threats. (§ 422.) The victims were Deputy Attorneys General Rama Maline, Michele Wong and Jonathan Kline and Deputy District Attorneys Kasey Sirody, Rachelle Dean, Melissa Suttner and Joann Roth. In addition, defendant was convicted of making a criminal threat directed at Mr. Leventhal. The jury also found hate crime allegations to be true as to two of the eight counts. (§ 422.55.) The details of those threats are set forth in part in *People v. Avila* (Aug. 27, 2015, B258329) [nonpub. opn.].

## B. The Present Charges

### 1. December 14, 2011, battery upon a custodial officer, count 23

Deputy Brian Alley was performing a security check at the Men's Central Jail on December 14, 2011. As Deputy Alley approached, defendant yelled, "You fucking bitch." Defendant twice threw what looked like urine at Deputy Alley. Deputy Alley was struck on his left side. Defendant was charged with battery by gassing in violation of section 243.9, subdivision (a) which provides, ". . . '[G]assing' means intentionally placing or throwing, or causing to be placed or thrown, upon the person of another, any

4

human excrement or other bodily fluids or bodily substances or any mixture containing human excrement or other bodily fluids or bodily substances that results in actual contact with the person's skin or membranes." Defendant denied engaging in the charged behavior. Defendant testified, "I didn't . . . throw anything on him."

### 2. December 30, 2011, attempted threats, counts 20, 21

Defendant wrote a letter dated December 30, 2011, addressed to Sheriff's Lieutenant Steve Whitmore. The letter read in part, "If I [am] move[d] back to [county jail] without a meaningful chance to de-brief on tape, with credence given, *I 'will spear' a deputy on fish row, just like a salmon.*" (Italics added.) Fish row was the area where defendant was housed.

### 3. May 28, 2012, attempted threats against superior court judges and federal or state prosecutors, counts 18 and 19

Defendant wrote a May 28, 2012 letter that stated in part: ". . . I want to make it clear that if any judicial officer of the Los Angeles County Superior Court upholds or grants the sheriff's decision to revoke my pro per status or privileges, revokes my pro per status or privileges on his or her own, or modifies the current orders relating to my telephone access, I 'WILL ASSASSINATE' that judicial officer. [¶] If any state or federal prosecutor files charges related to the above death threat, or uses it as probative evidence such as Evid. Code 1101(b), I 'WILL ASSASSINATE' that prosecutor." Deputy Smoldt was helping two other deputies waist-chain defendant as ordered by a lieutenant. The order was given in defendant's presence. Deputy Smoldt heard another deputy yell, "Watch out." Deputy Smoldt pivoted to the right. Defendant kicked Deputy Smoldt in the left hip. Deputy Smoldt fell backwards. Defendant began to spit at Deputy Smoldt. Had Deputy Smoldt not turned aside, he would have been kicked in the groin.

Defendant denied kicking Deputy Smoldt. Defendant testified, "I don't remember [Deputy] Smoldt there at all." Defendant denied kicking anybody on June 4, 2012. Defendant told the jury he was facing a wall at the time, so there was no way he could have kicked anybody.

### 4. July 24, 2012, battery upon a custodial officer, count 16

A custody assistant, Donald Hinton, was delivering mail at the Men's Central Jail on July 24, 2012. Defendant threw a liquid at Mr. Hinton. Mr. Hinton was hit on his left side. Defendant was laughing. He said, "I got you." Mr. Hinton testified: "It's mostly common when a staff member gets gassed that these inmates use urine or feces or any body fluid." Defendant denied throwing liquid at Mr. Hinton. Defendant testified Mr. Hinton was lying.

### 5. March 29, 2013, attempted murder (counts 1, 2, 4), assault (counts 5-12), weapon possession (count 13) and battery (count 14)

#### a. the battery

On March 29, 2013, Deputy Cecilio Felix was escorting inmates to the showers. Deputy Felix opened defendant's tray slot. This was done in order to handcuff defendant. Defendant threw urine at Deputy Felix. Deputy Felix was struck in the chest, stomach and groin areas. Defendant attempted to throw a second container of liquid at Deputy Felix. A videotape of the incident was shown to the jury. It did not include any audio recording. One hour later, defendant spoke to Lieutenant Edwin Alvarez. Defendant admitted assaulting Deputy Felix. Defendant said he would not leave his cell, had a shank and would use it. Defendant's statements led to a decision to extract him from his cell.

6

At trial, defendant denied throwing urine on Deputy Felix. Defendant testified he threw water, not urine. Defendant spoke to Deputy Felix. Defendant described what he said in that conversation: ". . . I thrown water on you because I want to get a misdemeanor. You're going to have me here for another year. If you don't add-charge me and I go to prison, then you're going to have to bring me back anyway. So if you don't charge me, either you charge me now or never . . . ." At another point, defendant testified he wanted to be "add-charged" for the urine throwing incident: "[I] had two and a half years in prison, I wanted to do misdemeanor time here and let my prison sentence expire, bail out at the misdemeanor fee of $2[,]500, work with the judge to continue my sentencing hearing past my prison release date, go up to prison, turn around so that I would receive a windfall of credits because the two systems don't communicate, the state and the county." Defendant further testified he was denied exculpatory evidence when Deputy Adam Vazquez threw the milk carton away. Defendant later spoke to Lieutenant Alvarez about the incident. In that conversation, defendant denied he had a weapon.

b. the extraction plan

As noted above, the determination was made to extract defendant from his cell. Sergeant Jesus Rojas was the supervisor in charge of the extraction team. Sergeant Rojas assigned seven deputies to the team—Blake Orlandos, Steven Provenzano, Adam Machado, Patrick Allen, Frank Quintana, Sunny Solomua and Anthony Casarez. The floor deputy, Daniel Martinez, and a videographer, Deputy Sam Carranza, were also present. The extraction team deputies were chosen for their size and athleticism. Deputy Orlandos, for example, was 6 feet, 3 inches tall and weighed 250 pounds. Deputy Provenzano was 6 feet tall and weighed 225 pounds. Deputy Allen was 6 feet tall and weighed 220 pounds.

Sergeant Rojas described the extraction plan to the jury: "The intent of the extraction is to pin [the inmate] being extracted using shields. You drive the person back [into the cell], pin them, pull their legs, bring them down, hold them down, flip them

7

over, hook them up, bring them out.  The idea is to use minimal force.  Use body weight holding people down.  Using people's strength to hold -- to be able to turn them and get their arms secured behind their back." Deputies Orlandos and Provenzano were described as the front-line men.  They were tasked with forcing defendant back into his cell and pinning him against the wall.  Both deputies were armed with shields and were wearing helmets.  Sergeant Rojas also wore a helmet.  Deputies Quintana, Allen and Solomua were the "capture" deputies.  They were assigned the "hands on" job of gaining control of defendant's limbs and restraining him.  Deputy Allen's job was to handcuff defendant.  The handcuffing was to occur once defendant was secure on the floor.  Deputy Machado was armed with pepper spray and a rubber bullet gun.  Deputy Casarez was armed with a taser.

### c.  the extraction

Prior to the extraction, defendant attached a shank to his right wrist.  Defendant bound the shank to his wrist so he would not lose possession of it during any altercation.  Sergeant Rojas described the weapon as consisting of, "Several razors hardened together at the tip with the harder portion, which I believe is a pencil, and wrapped with a large amount of string to keep them in place . . . ."

Defendant was given an opportunity to voluntarily exit his cell.  Sergeant Rojas spoke directly to defendant.  Sergeant Rojas testified:  "[H]e clearly understood I was speaking to him, and he asked me why.  I explained to him that the decision was made by the commanders based on earlier events that he was coming out of his cell.  At that point he just stared at me.  He looked at me.  He clearly was looking, and we . . . I'm looking at him.  He's looking at me.  I saw I wasn't gaining any ground.  Since the decision had been made, I brought my team forward."  Defendant was told he needed to be seen by the jail medical staff.  Defendant gave no indication he would comply.  Sergeant Rojas brought the extraction team forward.  Sergeant Rojas, Deputy Orlandos and Deputy Provenzano stood in the corridor directly in front of defendant's cell door.  The other

8

deputies fanned out behind them. They converged in an area approximately four feet deep from the cell door to the hallway wall behind them.

At Sergeant Rojas's direction, Deputy Machado twice introduced pepper spray into defendant's cell. On the videotape, the deputies can be heard coughing. But defendant had wrapped his face with a cloth and did not comply. Sergeant Rojas ordered Deputy Machado to prepare to fire rubber bullets at defendant. The sergeant then directed that defendant's electronic cell door be opened just far enough, three to four inches, to allow Deputy Machado to act. The moment the cell gate began to slide open, defendant burst forward, forced the gate open and powered his way out of the cell. Sergeant Rojas testified: "As soon as that door started to slide open, somehow [defendant] was able to open this door from rage, anger . . . . These doors take some effort to open. He was able to open it." Defendant was screaming and yelling. The deputies saw the shank in defendant's hand. Deputy Martinez yelled: "Shank, shank. He's got a shank." Defendant was swinging the shank up and down. The deputies variously described defendant's action with the shank as a "tomahawk," "stabbing," "slicing" and "hacking" motion. Deputy Orlandos testified, "'[W]hen the [cell] gate opened, [defendant] came out with like a tomahawk motion, raising his right hand above his head and thrusting down with a slashing device." Deputy Provenzano tried to pin defendant's arm with a shield. Deputy Provenzano testified, ". . . I pushed with all my might, and it was like nothing." Deputies Allen and Quintana moved forward to assist Deputy Provenzano. Deputy Allen pushed on Deputy Provenzano's back. Deputy Allen pushed as hard as he could. Deputy Allen was trying to keep Deputy Provenzano in place. Sergeant Rojas and Deputy Orlandos reached in and tried to grab defendant's arm. Deputy Solomua punched defendant in the face with a closed fist. But defendant continued to strike. Defendant was overpowering Deputies Orlandos and Provenzano. Deputy Machado fired rubber bullets hitting defendant in the upper chest. But the bullets did not deter defendant. The videotape shows Sergeant Rojas and Deputies Orlandos and Provenzano up against the cell door. This occurred as defendant forced his way out of the cell. The deputies closed in, trying to keep defendant contained. The deputies stood

up against each other, chest to back, from the cell door to the wall, all pushing forward. But defendant was forcing them back, up against the wall. Sergeant Rojas ordered Deputy Casarez to use the taser on defendant.

Eventually the deputies pulled defendant to the ground where the struggle continued. Defendant punched and kicked and tried to get up. Defendant continued to hack at the deputies with the shank. Deputy Martinez repeatedly told defendant to calm down and let go of the shank. Finally, 10 to 20 seconds after the altercation began, the deputies succeeded in restraining defendant. The jury viewed videotape and still photographs of the extraction.

Defendant testified that he no idea he was going to be moved from his cell. The first time defendant realized he would be removed was when the extraction team arrived. Defendant grabbed a blanket to absorb the pepper spray he knew the extraction team would use. Defendant also grabbed the "exacto knife" because he felt his life was in danger but he did not intend to use it as a weapon. But he decided he needed to use it. Defendant bound the shank to his right wrist so he could maintain possession of it in the event of an altercation. Defendant testified the door opened and the deputies shot him with rubber bullets. Eventually, defendant surrendered to the deputies. Defendant told the jury he believed the deputies had given him the razor blades and failed to retrieve them in an attempt to encourage him to commit suicide. The deputies had told him, "Why don't you do us a favor and kill yourself."

d. the deputies' injuries

Defendant injured four deputies with the shank during the extraction. Deputy Orlandos testified, "I received a horizontal laceration to my right forearm approximately five inches in length." Deputy Martinez sustained a minor laceration on the inside of his right middle finger. Deputy Quintana incurred a cut on his little finger. Deputy Provenzano sustained a laceration to his left inner forearm. Deputy Provenzano also

10

sustained injuries to his left knee.  The knee injuries required surgery.  Deputy Provenzano was away from work for more than one year as a result his injuries.

e.  defendant's statements in the aftermath of the extraction

Defendant was taken by ambulance to the hospital.  Deputy Gabriel Campos, III, rode with defendant.  During the trip to the hospital, the two spoke.  Defendant said he was tired of "all the mental health bullshit" and he had "no regrets" for what he did.  Defendant said that if a mental health employees tried to "move" him, he would "attack staff."  Defendant admitted he was, "[R]eady for the deputies when they came and [got him]."  Defendant said:  "I went right out of my cell.  They shot me with a 40 and that still didn't work."  When questioned, defendant also discussed his weapon.  The following transpired during their conversation:  "[Deputy] Campos:  Did you have a weapon or anything, or no?  [¶] . . . [¶]  [Defendant]: . . .  What I did is I took two pencils.  [¶] . . . [¶] . . .  And I tied them together.  And then I . . . took two . . . razors.  [¶] . . . [¶] . . . And then I put them there.  You know.  That's basically to defend myself.  [¶]  [Deputy] Campos:  Like a little slicer or . . . .  [¶]  [Defendant]:  Slicer, [e]xacto knife, yeah.  [¶] . . . [¶] . . .  To defend myself.  [¶]  [Deputy] Campos:  Those things do damage, though, . . .  [¶]  [Defendant]:  Yeah.  [¶]  Do you know if I got any of 'em with it?  [¶]  [Deputy] Campos:  I don't know.  Why?  What did you try to do, just slice them up or what?  [¶]  [Defendant]:  Yeah.  Yeah.  Slice to them.  Try to go through their helmets. . . .  [¶]  [Deputy] Campos: . . .  So by any means necessary you are . . . [¶]  [Defendant]:  Any means necessary, and that's what I did.  [¶]  [Deputy] Campos:  You were ready to defend yourself, huh?  [¶]  [Defendant]:  Yeah. . . .  I stuck to my word."

At the hospital, defendant told Sergeant John Glynn:  "[I]f [the mental health] staff ever issue a move in order without a court order . . . I will attack any [d]eputy that comes in that cell. . . .  And if you issue a move in order when I'm secure in the cell and a use of force incident occurs I'm gonna go full force at the [d]eputy. . . .  I am completely

11

satisfied, even though I got a broken arm attacking the [d]eputies when they came in. I'm glad I did it. And I will do it again when my arm heals because I have a right to refuse the [m]ental [h]ealth [s]ystem and I will do it at all costs."

On March 31, 2013, Deputy Jorge Meza escorted defendant to a clinic in the Twin Towers jail. Defendant asked Deputy Meza about the status of the deputies from Men's Central Jail. Defendant admitted manufacturing a shank. Defendant said he had aimed for the deputies' necks. Deputy Meza testified: "He said he tried to slash a couple of deputies in the neck . . . ."

6. July 15, 2013, attempted criminal threats, United States Supreme Court, count 24

On July 15, 2013, defendant sent a 40-page petition to the attention of Chief Justice John Roberts of the United States Supreme Court. In it he wrote: "If the United States Supreme Court does not grant review [of my petition] . . . then whichever one of the nine justices voted to 'deny' the grant for writ of certiorari WILL BE ASSASSINATED by one or more individuals who are not incarcerated persons with the means, weapons, and skills to carry out such ASSASSINATIONS, who are gang affiliated and are 'beneficially interested' in the granting of [the writ] . . . ." Defendant also wrote: "This is an extremely serious issue for gang members and the stated ASSASSINATIONS will be carried out towards whatever particular federal officials they become applicable to based upon the particular conditions of the death threat. The disposition of the petition is actively being monitored and will continue to be monitored by non-incarcerated gang affiliates . . . ." Defendant testified he thought these words would convince the justices to hear his petition. Defendant testified he believed his words would "trigger a threat assessment." Defendant said his goal was to get his petition heard. On July 25, 2013, defendant made a telephone call to the United States Supreme Court. Defendant spoke with a court clerk. He refused to identify himself.

### C. Defendant's Further Uncharged Conduct

#### 1. March 5, 2013

Defendant was scheduled to appear in court on March 5, 2013. Defendant knew he would be placed in leg irons. Defendant spoke to Deputy Eric Tunforss. Deputy Tunforss described what defendant said about a scheduled court appearance: "[H]e knew that they would be putting him in leg irons for court, and he stated that he would refuse to go in the leg irons and would kick any deputy that would try to put leg irons on him." Defendant also threatened to create a disruption in the courtroom in an attempt to get his case thrown out of court. Defendant denied making the foregoing statements. Defendant testified he went to and from court that day without incident.

#### 2. April 2013

Defendant addressed an April 10, 2013 document to Detective Paul Coblentz. Defendant wrote: "After I threatened to ASSASSINATE the dishonorable Judge Kevin John McGee, the state attorney general filed criminal charges . . . ." On April 18, 2013, Sergeant Carl Lumpkin accompanied a nurse who changed a bandage on defendant's leg. In the course of a conversation with Sergeant Lumpkin, defendant said: ". . . I'm gonna go to trial on [the attempted murder charges] and if I get sentenced to life, once I get off the chain to prison, I'm killing a cop, bottom line, so, you know, I'm gonna behave myself through my trial, see that I get my way and get out. If I go to prison for life, as soon as these chains come off [inaudible], mainline, I'm killing a cop, I'm stabbing him, that's my life goal. If I get out, my goal is to go back to school . . . [¶] . . . [¶] . . . I have a positive goal, and a negative goal. I have [two] goals."

On April 21, 2013, defendant wrote to Assistant County Counsel Roger H. Granbo. The letter stated in part: "If I do not get a response to this letter from you, then my next letter to you will contain a criminal DEATH THREAT pursuant to Pen. Code

13

422 and 76 subd. (a), threatening to <u>ASSASSINATE</u> a particular public official." In an April 22, 2013 document addressed to Captain Stover and others, defendant wrote: "I know exactly what [Men's Central Jail] is doing and if it does not stop, I will be forced to <u>GAS</u> [Los Angeles Department of Mental Health] staff or <u>your</u> staff if they prevent me from <u>gassing</u> [mental health department] employees. . . . [¶] . . . [¶] Forthright, I am ENTITLED to refuse any type of medical treatment, including mental health . . . . I have a <u>right</u> to be free from any compusatory, [*sic*] (1) diagnosis, (2) evaluations, or (3) observations by mental health employees. On March 29, 2013 (Good Friday), I sliced three peace officers at [Men's Central Jail] over [a mental health] movement order. Regardless of the fact that my arm was broken by deputies, at the end of the day, I GOT three cops. [¶] I want to make it <u>extrem[e]ly clear</u> to YOU, and all the individuals I have copied this memorandum to, that I have absolutely EVERY INTENTION to utilize <u>violence</u> to enforce my right to refuse affiliations or STIGMA to the mental health system. I am committed to doing <u>anything</u> that I deem necessary to be removed, disassociated, and unaffiliated with the mental health system, AT ALL COSTS, literally, whether that means I never see the outside world again because I receive life in prison or I end up becoming a quadra-peliegic [*sic*]. It is absolutely and unequivocally worth it to me. *I have absolutely no regret or remorse for my actions in slicing those three peace officers. As a matter of fact, I am just a little disappointed and acceptant about the fact that I did not* <u>*ASSASSINATE*</u> *at least one of them.*" (Italics added.)

### 3. May 3, 2013

On May 3, 2013, in the county jail, defendant gave a nurse, Karina Quitiquit, a document. The document read in part: "My goal is to get my arm as strong as possible so when I get up to state prison, I will be strong enough *to murder some random state peace officer* within the prison." (Italics added.) Defendant also said he was proud of slicing the three deputies. At trial, defendant admitted writing this document. He

14

understood that it might get someone's attention.  He understood its connection with the March 29, 2013 events.

#### 4.  June 16, 2013

On June 16, 2013, Deputy Albert Macias heard defendant threaten to kill a cop. Deputy Macias described defendant's threat, "I heard him say that his goal was to kill a cop when he catches the chain."  The phrase "catching the chain" refers to going to prison.

#### 5.  August 18, 2013

On August 18, 2013, defendant told Deputy Maurice Jolliff:  "Deputy Jolliff, I'm not going to go to court on the 10th, and that even with my broken arm, if you come and deputies come try to take me, I'm not going to go.  Fight them. . . .  Deputy Jolliff, if I see you, even though I have a broken arm, I'm going to fight you as well." Approximately 25 minutes later, defendant told Deputy Jolliff:  "You remember what happened to the deputies over at [the Men's Central Jail] that I sliced up? . . .  I'm going to slice you up as well in that fashion. . . .  Remember the one deputy that I sliced his arm up?  I know that when he wakes up in the morning now, he can't move his arm anymore."  Then defendant starting laughing.

### D.  Pretrial and Trial Proceedings in the Present Case

#### 1.  The September 10, 2013 preliminary hearing

Defendant's preliminary hearing in the present case commenced on September 10, 2013.  The matter was heard before Judge Dennis J. Landin.  Judge Landin was also the trial judge in the present case.  For clarity's purposes, we refer to Judge Landin as the

15

trial court. Later during the trial proceedings, issues arose concerning restraining defendant. In ruling on those issues, the trial court had heard all of the evidence presented and observed all of defendant's conduct at the preliminary hearing.

The following individuals testified at the preliminary hearing: Mr. Hinton, the gassing victim in count 16; Deputy Felix, the gassing victim in count 14; Deputy Michael Scott Culver, who described the incident involving Deputy Smoldt as charged in count 17; Sergeant John McClure, who testified to threats defendant made in August 2013; Deputy Meza, who repeated defendant's March 31, 2013 statement; in that statement, defendant admitted he had tried to slash the deputies in their necks; Sergeant Glynn, who had spoken with defendant at the hospital on March 29, 2013; Sergeant Rojas, the supervisor of the extraction team; Deputy Orlandos, who participated in the March 29, 2013 extraction; and Deputy Paul Coblentz, who testified to several written threats by defendant. Also, Deputy James Sexton, testified as to a statement made by defendant on the first day of the preliminary hearing. According to Deputy Sexton, "He said that the second goal in his life was to kill a cop." And, Deputy India Inez testified about several written threats issued by defendant.

Defendant was removed from the courtroom at the outset of the preliminary hearing after making loud noises designed to disrupt the proceedings. Defendant later reentered the courtroom to make a substitution of counsel motion. Defendant said he would physically resist any efforts to bring him to court. Defendant also stated: "I know this is on the record, and I know it's admissible. I have two goals in my life. One of my goals is to go back to school. . . . My other goal is to kill a cop when I get to prison." Later that day, the trial court inquired whether defendant wanted to remain in the courtroom. The following transpired: ". . . I will not come back at all. I don't care if I'm extracted. I'm prepared to extract from here on out. I will attack any deputies, even at CTC, in a hospital environment if any extraction orders are issued from this point forward. "Defendant then addressed the court clerk: "I'll be sending you a letter. When you get my letter, don't you put it as inoperative. Don't play that bitch game, or I'll send

16

you a death threat . . . ." Defendant also remarked in open court, "When the trial starts, I'll be ready to attack the cops."

2. The October 15, 2013 pretrial conference

In Superior Court case No. BA366400, tried before Superior Court Judge Craig J. Mitchell, defendant was convicted of eight counts of making criminal threats. The jury also found hate crime allegations to be true as to two counts. The evidence in that case established that: in July 2008, August 2009 and September 2009, defendant repeatedly threatened to kill Ventura County Deputy District Attorney, Marc Leventhal; in July 2009, defendant repeatedly threatened to kill Deputy Attorney General Rama Maline; defendant also threatened to kill Deputy Attorney General Jonathan Kline; and defendant threatened to rape and murder Deputy District Attorneys Kasey Sirody, Rachelle Dean, Melissa Suttner and Joann Roth. (*People v. Avila* (June 10, 2014, B247954) nonpub. opn.)

The trial court reviewed the entire file in case No. BA366400. During an October 15, 2013 pretrial conference, the trial court referenced the prior case in connection with defendant's self-representation request, which was denied: "[Y]ou, among other things, have disobeyed this court's order restricting your use of the phone, threatened to disrupt the proceedings and have disrupted the proceedings. [¶] You have made threats against the prosecutor and the courtroom clerk; you have refused to come to court; and you have interrupted the court, the district attorney, and your own attorney whenever you wanted to be heard. [¶] These actions are similar to and consistent with your behavior in case [No.] BA366400, where you were charged and later convicted of criminal threats. And in that case you refused to cooperate during the psychological evaluation, you threatened to gas any deputy who tried to move you against your will, you threatened to assault your own attorney, you threatened to assassinate the district attorney and judicial officers, and you used profanity toward at least one or more judges. [¶] Moreover, you have made statements in . . . a *Marsden* hearing . . . that have convinced this court that you fully

17

intend to manipulate the criminal justice system and lie to the court as part of a strategy to avoid a final conviction."

### 3. January 15, 2014

On January 15, 2014, defendant was due in court but refused to leave his cell. His actions were videotaped. Defendant had placed a sign in his cell door window which read: "NOTICE: Other than to feed me lunch and dinner DO NOT open any part of this door until 17:00 [hours]. I WILL ATTACK. Any DIRECTED use of force, period, lawful and unlawful. Pen. Code 69, w/a smile." Defendant spoke through the glass window in his cell door. Defendant said: "[T]his message is for the judge, it's for everyone in the courtroom here. It's intended to be played on the big screen. . . . So, Your Honor, you are now in excess of jurisdiction. I am warning you that I am prepared to attack; not passively resist, but actively attack at full physical will, any [p]eace [o]fficer that tries to remove me from this cell . . . . If any commitment [to a state hospital] is made, I will attack any peace officer who tries to execute your order to transfer me to any [state hospital]. I will attack any [p]eace [o]fficer that tries to move me to any Department of Corrections facility. . . . So, you're aware that [you're] in excess of jurisdiction, you're running amok. I am prepared to get hurt on any type of transfer outside of this facility. I am also pro-per in a civil federal case . . . . If this cell is searched outside of my presence . . . I will attack any of these deputies on the way back. I have a doctor's order for no leg chains . . . . That doctor['s] order overrides. That comes first, your safety second. My pride first, everyone's safety second. I am prepared to attack anyone . . . . So, if you proceed without me, realize that I am waiting day by day to attack any [p]eace [o]fficer. . . . ."

18

### 4. March 12, 2014

Defendant was scheduled for x-rays on March 12, 2014. However, defendant again refused to leave his cell. Defendant's refusal was videotaped. Defendant said: ". . . I will attack your staff [¶] . . . I'm gonna frick'in kick anyone. If I see that [unintelligible] I'll kick your staff. [¶] . . . [¶] . . . Come on this tier again and I'll gas you . . . . That's why I got this thing right here . . . ."

### 5. April 11 and 12, 2014

On April 11 and 12, 2014, defendant spoke with Sergeant Robert Gillis. The conversation was video-recorded. Defendant said he would "gas" certain classes of individuals—jail investigation unit deputies, jail mental evaluation team members, lieutenants and higher ranked deputies—if they approached his cell. Defendant also spoke to Sergeant Gillis about what would happen if there was a cell extraction. The following occurred during direct examination of Sergeant Gillis: "Q. [D]id he say that he could withstand a half hour of [gas] and he was going to kill someone when he came out. [¶] A. Yes." Defendant testified certain portions of the video recording of the conversation with Sergeant Gillis had been erased. During the unrecorded portion of their conversation, defendant testified he was threatened he would be shot in the head with rubber bullets.

### 6. May 6, 2014: the trial commences

Defendant's jury trial commenced on May 6, 2014. Early that morning, defendant refused to voluntarily exit his cell. He threw what he described as "water" on the deputies saying, "That's my answer." He also threatened, "If you come in here I'm gonna try and kill you guys." Defendant resisted the subsequent extraction. Defendant was armed with a shank, which he bound to his wrist. Defendant complied only after the

19

deputies pumped gas into his cell. At trial, defendant admitted had armed himself with a shank. He told the jury, "I'm proud I stood my ground . . . ."

Defendant subsequently appeared in the courtroom strapped to a gurney. Detective Inez described to the trial court the efforts required to secure defendant's presence in the courtroom stating, "The entire process . . . took about [an] hour, hour and a half" and required a team of six deputies. Detective Inez said the extraction required "extraordinary measures" and was "extremely taxing" for the sheriff's deputies.

Defense counsel, Jimmie Johnson, asked that defendant be allowed to sit in a chair. A sheriff's lieutenant identified only as Lieutenant Thrall was present in the courtroom. Lieutenant Thrall oversaw custody investigative services in the jail system. The trial court inquired of Lieutenant Thrall what restraints would be appropriate if defendant chose to attend the trial. The lieutenant explained: "If this individual, in any way, becomes a problem for us, we would most likely restrain him in the same way and keep him that way the entire time. . . . [T]he reason being that every time we have to take him out of this device, chair or gurney, . . . we have a potential assaultive issue we have to tactically deal with. So whatever we do, we need to keep him in that same position the entire time if that's okay with the court." The trial court then inquired whether there was a chair that could be used rather than the gurney. Lieutenant Thrall responded: "There is a chair, but it would be less comfortable than that gurney over long periods of time." The trial court then suggested that sheriff's department representatives meet with defendant and "talk that through." The trial court also commented: ". . . I'll ask the sheriffs to have only enough deputies that you think are necessary to ensure the safety of court personnel and the public in the courtroom when the jurors are present . . . ."

The trial court revisited the restraint issue later that same day: "The Court: . . . [¶] . . . [¶] . . . [I]f [defendant] chooses to come voluntarily [to court], you don't have to put hands on him, he's cuffed, is there any reason for the gurney? [¶] [Lieutenant] Thrall: His past actions really show that he needs to be in this gurney. The chair that we speak about, he can only be in that chair for a certain amount of time. If it causes us

20

tactical problems, if we have to get him in and out of the chair constantly – [the gurney is] pretty safe. It's pretty comfortable. I don't think that it would be any different if he was strapped up to a chair than this. [¶] The Court: Are you telling me that you believe those are the only two options in light of his behavior, the chair or gurney versus having him shackled? [¶] [Lieutenant] Thrall: His behavior in the past of stabbing deputies, slashing them, hurting them, this all could be done quickly and to any of your staff, any of my staff. I think it would be in our best interest to keep him [on] the gurney. . . . [¶] . . . [¶] The Court: . . . Tomorrow why don't you try the safety chair, and if it is less comfortable, maybe [defendant] will want to go back to the gurney quietly." The courtroom bailiff interjected: "The policy is that they are only allowed to be in the safety chair for two hours, and then we have to obviously move them and then put them back. That creates another issue."

Sergeant Larry Meade advised the court: "The issue here is a matter of safety of [defendant], my staff and court and everyone in the courtroom. The history [defendant] has shown can be very violent and can be very benign. Now, the safety chair has limitations, as the deputy explained here. The gurney is very comfortable. . . . [A]nd the reason why Lieutenant Thrall and I and most people agree on our side regarding [defendant] is we don't know when he will decide that he doesn't like something and get violent. . . . I am trying to avoid a situation where we have to use force on him because he's free rather than having him in the gurney . . . . [We don't want to have] an issue while in transport. That's the biggest concern. [¶] . . . [¶] . . . I will say that safety is the issue. The safety chair requires rotation. Anything short of the gurney where he's restrained and any given time that propensity is there – and I really don't want to take those chances with him and with my staff." The trial court ruled it was appropriate to use the gurney for the next trial date and then, "[We will] see how it plays out and think about other options."

### 7. May 7, 2014

The following day, May 7, 2014, defense counsel inquired: "Will [defendant] be in a chair tomorrow?" The trial court responded: "We need to talk about that. Here's the problem I see. In light of what I heard, if [defendant], in fact, has to be taken out every two hours, that's going to put people at risk. It's easy for me to say to do it anyway, but I'm not the one put in harm[']s way. Given the struggle it took to get him here and how he was able to produce a shank, I'm still concerned about whether or not it's appropriate to have him in a chair that requires him to be released. [¶] . . . [¶] . . . [I]f it[']s not appropriate to keep him in a chair for beyond two hours, that might cause other problems. Then we shouldn't go down that road. [¶] . . . [¶] . . . I could meet with the deputies . . . and have a discussion off the record and then put it on the record about an alternative. . . . At this point I'm not going to require the sheriffs to bring him in a chair tomorrow. . . . [¶] Mr. Johnson: Can you require the chair be available tomorrow? [¶] The Court: Well, I'll talk to the sheriffs about that off the record before the end of the day. They can give me some information about that. Right now there's no reasonable alternative."

### 8. Defendant's May 15, 2014 mistrial motion

On May 15, 2014, defense counsel made the following statement at sidebar: "I want to make a record. [Defendant] is still on this gurney in court lying next to counsel table. He has a white sheet over him. There are three black straps that are securing him to the gurney and generally three to five deputies sitting here by - - now there's two. They have these thick vests. They appear to be bullet-proof vests. I think this sheriff is communicating to the jury that [defendant] is a very dangerous person. I don't think he can get a fair trial. I'm going to move for a mistrial. I asked several times that [defendant] be allowed to sit in this chair. The chair they usually use for inmates who are considered to be unruly is called a stealth chair. That's what it's referred to in that

22

manner because the inmate is strapped to the chair, but it's done in a way that's not visible to the jury. [¶] [Defendant] is also handcuffed to the gurney. At times the sheet over his body moves, and you can see that his hands are handcuffed. So he's in effect, being shackled, strapped to this gurney, handcuffed to the gurney, and I think it's going to make it very difficult, if not impossible, for him to get a fair trial from this jury. This has gone on every day for the trial." The trial court deferred its ruling on the matter to a later point in the day.

The trial court subsequently viewed, outside the jury's presence, a videotape of the May 6, 2014 extraction. The trial court observed: "[W]hat I see here confirms my belief that there has been and still continues to be an amount of necessity to restrain [defendant] on the gurney. [¶] . . . [¶] . . . That it took the gassing of [defendant] to gain compliance. And it's my belief that if he was in any other restraints, he would pose a risk to everyone in this courtroom." The trial court then discussed the scene in the courtroom and whether or not the jury might have observed that defendant was handcuffed to the gurney: "First of all, . . . [defendant's] feet are about ten feet from where I sit. And I have a clear view of his feet and . . . and right side of the gurney. I did not see earlier today his hand cuffed to that gurney. Maybe you saw it, Mr. Johnson, but - - [¶] Mr. Johnson: At one point, the sheet moved and I . . . could see it. [¶] The Court: And that's why I think I have to lay some further information out for the record. [¶] [Mr. Johnson, who is at counsel's table, is to defendant's left.] [¶] . . . [And Mr. Johnson is] just about two and a half to three feet from [defendant's] left torso. . . . And at the next table is the investigating officer Inez; and in front of her is the overhead projector . . . ; and in front of it and to the left of that in front of both Inez and [Deputy District Attorney Phillip] Stirling is a laptop computer which has been there most of the trial; [¶] and then, of course, there's Mr. Stirling and then a few feet to Mr. Stirling's left is the jury box. [¶] So even if you could see [defendant's] hand handcuffed, Mr. Johnson, I seriously doubt whether any of the jurors could have seen that. I certainly didn't see it, and I've been looking at [defendant] throughout the trial to determine if any restraints were visible other than the ones over his body. . . . [¶] And also yesterday . . . there was an outburst

23

on [defendant's part]. He became loud and disruptive, and I thought at that point he might try to move from his current location; but because he's secured, I don't think that's a possibility." The trial court then denied the defense mistrial motion.

### 9. The May 16, 2014 Evidence Code section 402 hearing

On May 16, 2014, Mr. Johnson asked the trial court to modify its order regarding defendant's restraints. The trial court held a hearing outside the jury's presence as to the place in the courtroom from which defendant would testify. The trial court described defendant's restraints, "For the record, he is still in the gurney and has three straps covering a sheet that is covering him." The trial court called Sergeant Theresa Culberson to testify and inquired, "Can you comment on whether or not placing [defendant] in the witness chair and securing him to [it] is a workable solution?" Sergeant Culberson testified, "If [defendant] came up and was cooperative in sitting in the chair and then became uncooperative trying to place him back on a gurney, it would pose a danger to the courtroom and staff who would have to restrain him back into the gurney." Sergeant Culberson further testified that given defendant's exhibited strength, he could not be safely restrained in the witness chair. On cross-examination, Mr. Stirling asked Sergeant Culberson, hypothetically, whether defendant could be safely handcuffed in the chair which was bolted to the floor with waist-chains and leg shackles. Sergeant Culberson responded: "There's been special teams that have accompanied [defendant] here to court, and they have had difficulty extracting him from the cell and placing him into the gurney. It would be an added risk to ask them . . . to unstrap him from the gurney and then re-restrain him to bring him up here." [*Sic*.] When defendant's lawyer, Mr. Johnson, questioned Sergeant Culberson, the following testimony was presented: "Q. So what you're saying is that you believe that if he were to become unruly, he'd be difficult restrain on the witness stand; correct? [¶] A. Yes." Sergeant Culberson's concern arose from defendant's numerous outbursts in courtrooms and the verbal threats made against Mr. Johnson and sheriffs deputies. The trial court ruled: ". . . I'm not going to change

24

my ruling. Placing [defendant] in the safety chair or on the witness stand, it's just not a real alternative given what I know about [defendant's] behavior. If he's removed from the gurney while in the courtroom or even in the courthouse and then later refuses to get back onto that gurney, it would require the sheriffs to use substantial force and put people at risk, including [defendant]. As I've seen from the videos that have been presented in this case, someone could get seriously hurt, including [defendant]. So I'm not going to take the risk. And, of course, it would certainly delay the proceedings in ways I can't even anticipate."

On behalf of defendant, Mr. Johnson, objected. Mr. Johnson argued defendant had never become unruly or attacked anyone in court. The trial court noted that although the jury could see defendant was strapped to the gurney, there were no visible chains, handcuffs or leg irons. Further, the trial court stated: "I don't know how he's secured to the gurney under the sheet. I haven't seen that."

The prosecutor, Mr. Stirling, countered that defendant had been violent in the courthouse as well as in the jail. Mr. Stirling explained that defendant had kicked a deputy and had threatened to murder judges or their families. Also, defendant had had threatened to murder Mr. Stirling. In reference to Mr. Stirling, defendant had stated, "If it was legal, I'd shoot your ass," or "kill your ass." Mr. Stirling argued: defendant had threatened Sergeant Culberson; in a recorded statement, defendant had expressed an intent to kill to kill deputies; and defendant had been found with a second shank 9 or 10 days earlier. Mr. Stirling argued: "All of this behavior is his choice. He doesn't like the situation where he's being defined as a different type of witness than the other witnesses because of something that Your Honor whimsically thought about, that he's charged with these crimes for example. He is voluntarily, knowingly and willfully engaging in behavior, which he has been warned about over and over and over, and he continues to do it. Therefore, it changes the equation." In addition, Mr. Stirling explained that the jurors had been questioned during the jury selection process about the security precautions in the courtroom. And they were instructed they were not to use the security precautions as evidence of guilt. Mr. Stirling concluded, "They all promised they could do that."

25

The trial court declined to change its ruling. The trial court emphasized that its decision was based on defendant's size and strength, and the extreme measures that had to be taken to get him to comply with deputies. The trial court reasoned that if a need arose to subdue defendant in the courtroom, everyone present would be at substantial risk of harm. The trial court subsequently described defendant's restraints: "[T]he record should be clear that [defendant] . . . is not laying flat on a gurney. He's propped up, and his head is almost as high as yours when you're standing, [Mr. Johnson]."

The sheriff's department later presented an alternative plan for securing defendant during his testimony. The trial court described the plan: "If [defendant] testifies, he'd have to be secured to the chair. On both sides of him would be two deputies, one armed with a taser, and a third deputy probably seated by my court reporter. So he'd be basically surrounded by the personnel who are clothed in [protective vests]." The trial court commented, "[I]n my view, [this plan] may be even more prejudicial, counsel." The trial court then asked the deputies to take their intended positions and described the scene for the record: "One deputy is seated to the right of the witness stand. Another deputy is about seven to eight feet against the wall by the entrance to the jury deliberation room and between the jury box. A third deputy is seated in front of what would be juror number 9."

Defendant testified before the jury from the witness stand. He was secured to the chair. A deputy sat to the right of the witness stand. Another deputy stood between the jury box and the entrance to the jury deliberation room. A third deputy was seated in front of the jury box. One deputy was armed with a taser. The deputies wore protective vests.

### 10. Defendant's repeated interruptions during trial

Defendant repeatedly interrupted the trial proceedings. He engaged in a number of outbursts during the trial. While Sergeant Rojas was on the stand, defendant blurted out: "Punk ass bitch motherfucker. [¶] . . . [¶] . . . How would you like it if I shot you

26

two times, man?" The trial court instructed the jury to leave the courtroom. As the jurors were exiting, defendant stated: "Medically clear me? Punk ass bitch. Nobody told you I was psycho, huh? Punk ass bitch. I want to see the psyche doctor, mother fucker." The trial court observed, "[Defendant] is now raising his voice . . . ."

Defendant interrupted the proceedings again while Deputy Quintana was on the stand: "The Defendant: Charlie horse, man. Bullshit. Fuck. Ridiculous, man. [¶] . . . [¶] . . . I got Charlie horse, Your Honor, and it hurts. [¶] . . . [¶] . . . Can't sit in a chair like a normal person? [¶] . . . [¶] . . . Hurts, dude. Fuck, man. [¶] . . . [¶] . . . They are just hiding all the bullshit. I'm in orange. [¶] The Court: Folks, go into the jury room for just a moment. [¶] The Defendant: Take an idiot for one person to find not guilty and hang the jury. Bullshit, man. Fucking hurts, man. I want to sit like a normal fucking person. It's going to hurt. I need to stretch my fucking legs. [¶] The Court: The record should reflect we're outside the presence of the jurors. [¶] The Defendant: I could have sat like a normal fucking person." The trial court noted defendant's voice was "very loud."

## III. DISCUSSION

### A. Restraints

As described above, defendant was restrained throughout the trial. Except while testifying, defendant was on a hospital gurney. He was handcuffed to the gurney. He was covered with a sheet over which three straps were visible. Several sheriff's deputies wearing protective vests guarded defendant. We previously set forth the trial court's description of the security measures in place when defendant testified. During his testimony, defendant was secured to the witness chair. A deputy sat to defendant's right. Another deputy stood between the jury box and the entrance to the jury deliberation room. A third deputy was seated in front of the jury box. One deputy was armed with a taser.

27

Defendant argues his constitutional and due process rights were violated when he was required to appear at trial under restraint visible to the jury and guarded by deputies. In addition, defendant argues the foregoing constituted an abuse of judicial discretion. As our Supreme Court has explained: "The 'court has broad power to maintain courtroom security and orderly proceedings.' (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.) On appeal, its decisions on these matters are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 633.) Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence unless there is a showing of a manifest need for such restraints.' (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"— such as the interest in courtroom security—specific to the defendant on trial.' (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) . . . 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." (*Deck v. Missouri*[*, supra,* 544 U.S.] at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' (*People v. Gamache* (2010) 48 Cal.4th 347, 367.) Although the court need not hold a formal hearing before imposing restraints, 'the record must show the court based its determination on facts, not rumor and innuendo.' (*People v. Stevens,* [*supra,*] at p. 633.)" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1270-1271; accord, *People v. Jackson* (2014) 58 Cal.4th 724, 738.)

There are different standards applied to the presence of deputies in proximity to an accused and the presence of visible physical restraints. The presence of deputies in the courtroom, including in close proximity to the defendant, need not be justified by a showing of manifest need or an essential state interest. (*Holbrook v. Flynn* (1986) 475 U.S. 560, 569 (*Holbrook*); *People v. Stevens, supra,* 47 Cal.4th at pp. 633-635, 638.) In *Stevens,* our Supreme Court explained at length that stationing additional security guards or law enforcement officers in a criminal courtroom is not inherently prejudicial. (*People*

*v. Stevens, supra,* 47 Cal.4th at pp. 633-641; see *People v. Bryant* (2014) 60 Cal.4th 335, 390.) Unless law enforcement officers are present in unreasonable numbers, the trial court need not justify their presence. (*People v. Stevens, supra,* 47 Cal.4th at p. 634; *People v. Duran, supra,* 16 Cal.3d at p. 291.) There is a wide range of inferences a jury could reasonably draw from the presence of law enforcement officers in a criminal courtroom. The United States and California Supreme Courts have explained their presence need not be interpreted as a sign the defendant is unusually dangerous or culpable. And even when the sight of additional deputies in a courtroom may create an impression of dangerousness, it does not give rise to a presumption of inherent prejudice. (*Holbrook, supra,* 475 U.S. at p. 569; *People v. Stevens, supra,* 47 Cal.4th at p. 635.)

In *Stevens,* for example, a deputy sat or stood next to the defendant while the accused testified. Our Supreme Court held no showing of manifest need was required to justify the deputy's presence while the defendant testified: "We conclude a deputy's presence at the witness stand during a defendant's testimony is not inherently prejudicial. As the United States Supreme Court observed over 20 years ago, jurors have become accustomed to seeing security officers in public places such as the courtroom (*Holbrook, supra,* 475 U.S. at p. 569), and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant. Because security officers are now 'ordinary and expected' in the courtroom (*People v. Jenkins* [(2000)] 22 Cal.4th [900,] 998), jurors may view the sight of an officer accompanying the defendant to the witness stand as nothing more than a routine measure. (*Holbrook,* [457 U.S.] at p. 569; see *People v. Miranda* [(1987)] 44 Cal.3d [57,] 115[, limited on another point in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4].) Although a deputy's presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the Supreme Court has made it clear that not 'every practice tending to single out the accused from everyone else in the courtroom must be struck down.' (*Holbrook, supra,* 475 U.S. at p. 567.) 'Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance,' the high court stressed that it has 'never tried, and could never hope, to

eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.' (*Ibid.*) That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial." (*People v. Stevens, supra,* 47 Cal.4th at p. 638; see *Hill v. Ozmint* (4th Cir. 2003) 339 F.3d 187, 189.) Here, the trial court directed that, "[T]he sheriffs . . . have only enough deputies that you think are necessary to ensure the safety of court personnel and the public in the courtroom when the jurors are present . . . ."

No abuse of discretion or violation of any constitutional rights occurred. No doubt, the use of visible restraints tends to: undermine the presumption of innocence and the related fairness of the fact-finding process; diminish a defendant's right to counsel; prejudice a defendant's ability to communicate and to participate in his or her own defense; and undermine the objective of maintaining a dignified judicial process. (*Deck v. Missouri, supra,* 544 U.S. at pp. 624, 629-631; *People v. Jackson, supra,* 58 Cal.4th at p. 739.) But, as the United States Supreme Court has articulated, "There will be cases, of course, where these perils of [restraint] are unavoidable." (*Deck v. Missouri, supra,* 544 U.S. at p. 632; accord *Lakin v. Stine* (6th Cir. 2005) 431 F.3d 959, 962.) The evidence unequivocally demonstrated defendant posed an extreme safety risk based on: his size and exhibited strength; his extensive history of threatening and assaultive conduct; his repeated use of a shank; his complete lack of remorse; his stated goal to kill a law enforcement officer; his disruptive behavior; and the repeated incidents during which he put himself and others at risk of serious injury or death. Moreover, during the preliminary hearing, defendant remarked in open court, "When the trial starts, I'll be ready to attack the cops." Given defendant's history, the trial court could reasonably conclude this was not an idle threat. There was a manifest need for the restraint and an essential state interest in protecting: jurors; witnesses; attorneys; deputies; judges; court staff; spectators; and all others present in the courthouse, including defendant himself.

Defendant argues the trial court abdicated its decision-making power and allowed the sheriff's deputies to *determine* how defendant was to be restrained. Defendant

30

correctly notes it was the trial court's duty to decide what restraints were justified based on the facts. (*People v. Montes* (2014) 58 Cal.4th 809, 841; *People v. Lomax* (2010) 49 Cal.4th 530, 559.) The trial court was required to make its own decision based on the facts in this case; it would be error to rely solely on the deputies' judgment. (*People v. Lomax, supra,* 49 Cal.4th at p. 561; *People v. Mar* (2002) 28 Cal.4th 1201, 1218.) A trial court abuses its discretion if it abdicates its decision-making authority to court security personnel. (*People v. Mar, supra,* 28 Cal.4th at p. 1218; *People v. Hill* (1998) 17 Cal.4th 800, 841.) The record must demonstrate the trial court made the determination independently. (*People v. Lomax, supra,* 49 Cal.4th at p. 561; *People v. Mar, supra,* 28 Cal.4th at p. 1218.) We disagree with defendant's characterization of the trial court's decision-making. While the trial court properly consulted with the deputies and other sheriff's personnel in considering the issue, it did not simply rely on their judgment. The trial court heard the attorneys' arguments, considered the evidence, listened to the deputies' opinions and concerns and then made its own carefully considered, independent determination.

Our Supreme Court has further held, "'[A] trial court should select the least obtrusive [restraint] method that will be effective under the circumstances. [Citation.]' (*People v. Gamache* [*supra,*] 48 Cal.4th [at p.] 367.)" (*People v. Montes, supra,* 58 Cal.4th at p. 841; accord, *People v. Lomax, supra,* 49 Cal.4th at p. 562.) Here, the trial court was faced with the need to handle an extremely dangerous and particularly disruptive defendant. Use of restraints was unavoidable in the face of the dire risk of injury to defendant and others. The trial court considered the lesser alternative of a safety chair. The court was advised, however, that defendant would have to be released from the chair at regular intervals. The trial court reasonably concluded repeatedly releasing defendant from his restraints would pose an unreasonable risk of danger. After considering all the circumstances, including available alternatives, the trial court employed the fairest, most reasonable restraint available.

The jury did see defendant strapped to the gurney, secured to the witness chair and closely guarded. The jury may have realized the gurney itself was in fact a restraint. But,

31

even if the jurors viewed the gurney as a restraint, what they saw was not so inherently prejudicial as to pose an unacceptable threat to defendant's fair trial right. (See *Holbrook, supra,* 475 U.S. at pp. 570-572; *People v. Ayala* (2000) 23 Cal.4th 225, 252-253.) The evidence at trial overwhelmingly depicted defendant as a very violent, unremorseful, menacing individual who threatened to kill jurists, lawyers and peace officers. Defendant's interruptions and outbursts at trial reinforced that image. In light of those facts, the precautions taken would not have unfairly suggested to the jury that defendant was any more violent than they already knew him to be.

### B. Sufficiency of the Evidence of Attempted Premeditated Murder

Defendant asserts there was insufficient evidence of a specific intent to kill each of the three victims—Deputies Orlandos, Provenzano and Rojas. In addition, defendant argues there is insufficient evidence he committed a direct but ineffectual act toward killing any of them. Defendant argues in part: "The facts reveal [defendant] was swinging the shank indiscriminately, trying to strike and fend the deputies off . . . . There was no testimony [defendant] yelled out or said anything during the entire incident that indicated he was intent on killing anyone." This contention is meritless.

We apply the substantial evidence standard of review: "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' (*People v. Jones* (1990) 51 Cal.3d 294, 314.)" (*People v. Perez* (2010) 50 Cal.4th 222, 229; accord, *People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

Attempted murder requires a specific intent to kill and the commission of a direct but ineffectual act toward accomplishing that goal. (*People v. Perez, supra,* 50 Cal.4th at p. 229; *People v. Smith, supra,* 37 Cal.4th at p. 739.) Our Supreme Court has held, "'The

mental state required for attempted murder is the intent to kill a human being . . . .' (*People v. Stone* (2009) 46 Cal.4th 131, 140.)" (*People v. Perez, supra,* 50 Cal.4th at p. 225; *id.* at p. 229; accord, *People v. Bland* (2002) 28 Cal.4th 313, 328 [to constitute an attempted murder, the guilty person must intend to take life].) As to each of the attempted murder counts, the prosecution had to prove defendant acted with specific intent to kill each victim. (*People v. Perez, supra,* 50 Cal.4th at p. 230; *People v. Smith, supra,* 37 Cal.4th at p. 739.) As our Supreme Court explained in *Stone,* "'[G]uilt of attempted murder must be judged separately as to each alleged victim.'" (*People v. Stone, supra,* 46 Cal.4th at p. 141; accord *People v. Perez* (2010) 50 Cal.4th 222, 230.) The requisite mental state is rarely susceptible of direct proof; it may be inferred from the defendant's acts, including conduct leading up and the circumstances surrounding the act. (*People v. Thomas* (2011) 52 Cal.4th 336, 355; *People v. Avila* (2009) 46 Cal.4th 680, 701; *People v. Smith, supra,* 37 Cal.4th at p. 741.)

As set forth above, defendant had an extensive prior history of threatening and assaultive conduct. In advance of the extraction that led to the attempted murder charges, defendant talked to Lieutenant Alvarez. Defendant said he would not leave his cell, had a shank and would use it. Defendant armed himself with the shank. It consisted of several razor blades hardened together. Defendant attached the shank to his wrist so that he would not lose it when he assaulted the deputies. He covered his face with a cloth to protect himself from pepper spray. Sergeant Rojas and Deputies Orlandos and Provenzano, the attempted murder victims, stood directly in front of defendant's cell door. Other deputies fanned out behind them. The deputies filled a space approximately four feet deep from defendant's cell door to the hallway wall behind them. Deputies Orlandos and Provenzano were tasked with forcing defendant back into the cell. They were to pin him against the wall using their bodies and their shields.

The moment the door slid open a few inches, defendant burst from his cell, forcing the gate open further. Defendant overpowered Sergeant Rojas and Deputies Orlandos and Provenzano. Defendant repeatedly hacked and sliced at them with the shank. Defendant raised his hand above his head and thrust it down in a slashing motion. He

33

swung the shank like a tomahawk in a hacking motion. Deputy Orlandos sustained a horizontal laceration to his right forearm which measured approximately five inches in length. Deputy Provenzano sustained a laceration to his left inner forearm. During the ambulance ride to the hospital, defendant bragged he was ready for the deputies when they came to get him. Defendant admitted trying to slice Sergeant Rojas and Deputies Orlandos and Provenzano by piercing their helmets. At the hospital, defendant told Sergeant Glynn: "I am completely satisfied, even though I got a broken arm attacking the [d]eputies when they came in. I'm glad I did it." Two days later, on March 31, 2013, defendant spoke to Deputy Meza. Defendant admitted during that conversation he had "tried to slash a couple of deputies in the neck" and had aimed for their necks. The foregoing was substantial evidence defendant attempted to murder Sergeant Rojas and Deputies Orlandos and Provenzano.

## C. Sentencing

### 1. Counts 13, 14, 16, 17 and 23

Defendant was convicted in counts 13, 14, 16, 17 and 23 of non-violent, non-serious felonies. As a result, he was sentenced indeterminate on those counts pursuant to sections 667, subdivisions (e)(1) and (e)(2)(C), and 1170.12, subdivisions (c)(1) and (c)(2)(C). The trial court erroneously designated count 2—as to which an indeterminate term was imposed—as the principal term. (*People v. Rodriguez* (2011) 207 Cal.App.4th 204, 211-212; *People v. Neely* (2009) 176 Cal.App.4th 787, 797.) When imposing determinate sentences, the principal term must be a determinate, not an indeterminate term. The trial court thus neglected to correctly impose the principal term/subordinate term methodology of section 1170.1. (*People v. Nguyen* (1999) 21 Cal.4th 197, 199-200, 207; accord, *People v. Sasser* (2015) 61 Cal.4th 1, 11.) There was no section 667, subdivision (d) or section 1170.12, subdivision (b) prior conviction allegation with

respect to count 16. Therefore, the trial court properly declined to double the sentence imposed on count 16. The parties assert the trial court should have imposed two-year sentences on counts 13 and 14, and 16-month sentences on counts 17 and 23. However, we need not discuss this issue. Upon remittitur issuance, the trial court must resentence defendant on the determinate terms and exercise its discretion as to which count to designate as the principal term. (*People v. Rodriguez, supra,* 207 Cal.App.4th at pp. 211-212; *People v. Miller* (2006) 145 Cal.App.4th 206, 216.)

## 2. Weapon use enhancements

The trial court imposed section 12022, subdivision (b)(1) enhancements on counts 7 and 9. However, the jury found those allegations not true. Therefore, as the parties agree, the judgment must be modified to omit those enhancements and the abstract of judgment amended to so reflect.

## 3. Court facilities assessments

The trial court failed to orally impose the Government Code section 70373, subdivision (a)(1) court facilities assessments *as to each count*. The oral pronouncement of judgment must be modified to so provide. (*People v. Rosales* (2014) 222 Cal.App.4th 1254, 1263; *People v. Sencion* (2012) 211 Cal.App.4th 480, 483-485.)

## 4. Prior serious felony convictions

The jury found that defendant had been convicted on two distinct occasions of making criminal threats in violation of section 422, subdivision (a). The jurors found that defendant had been convicted of eight counts of making criminal threats in the Los Angeles Superior Court case No. BA366400. Additionally, the jurors found the defendant had been convicted of six counts of making criminal threats in Ventura County

35

case No. 2008030495.  A conviction for making a criminal threat is a serious felony.  (§ 1192.7, subd. (c)(32); *People v. Banuelos* (2005) 130 Cal.App.4th 601, 604.)  However, the trial court imposed no section 667, subdivision (a)(1) five-year enhancements on any of the serious felony counts in the present case.  We agree though with defendant that the prosecution has forfeited the right to seek imposition of the section 667, subdivision (a)(1) five-year prior conviction enhancements because:  the information does not allege the five-year enhancements; the jury was never instructed on the elements of a serious prior conviction allegation; the prosecutor never argued such a finding should be returned before the trial court or the jury; and the prosecutor never sought imposition of the enhancements in it sentencing memorandum or in the argument of the deputy district attorney at the sentencing proceeding.  (*People v. Najera* (1972) 8 Cal.3d 504, 508-512; *People v. Salas* (2001) 89 Cal.App.4th 1275, 1282; *People v. Esquibel* (1992) 3 Cal.App.4th 850, 858-859; *People v. Anderson* (1975) 50 Cal.App.3d 325, 334; *People v. Spencer* (1972) 22 Cal.App.3d 786, 801-802.)

### 5.  The abstract of judgment

The abstract of judgment must fully comport with the oral pronouncement of judgment.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Vega* (2015) 236 Cal.App.4th 484, 506.)  The abstract of judgment must be modified to:  omit the section 12022, subdivision (b)(1) enhancements on counts 7 and 9; to reflect that a sentence of 45 years to life was imposed on counts 1, 2 and 4 (plus enhancements); and state a sentence of 25 years to life was imposed on counts 5 through 12, 18, 20 and 24 (plus enhancements).  The abstract of judgment in this case contains extensive material errors.  Parts of the abstract of judgment are illegible or unreadable.  The best course of action is to have the trial court personally supervise the preparation of the amended abstract of judgment.  (*People v. Acosta* (2002) 29 Cal.4th 105, 110, fn. 2; *People v. Chan* (2005) 128 Cal.App.4th 408, 425-426.)

## IV. DISPOSITION

The oral pronouncement of judgment is modified to impose the Government Code section 70373, subdivision (a)(1) court facilities assessment as to each count. The judgment is modified to omit the Penal Code section 12022, subdivision (b)(1) enhancements imposed on counts 7 and 9. All of the determinate sentences are reversed and the matter is remanded for resentencing as to those terms. Upon remittitur issuance, the trial court shall exercise its discretion under Penal Code section 1170.1, subdivision (a) as to counts 13, 14, 16, 17 and 23. The superior court clerk court, under the direct supervision of the trial court, is to prepare an amended abstract of judgment that: omits the Penal Code section 12022, subdivision (b)(1) enhancements as to counts 7 and 9; sets forth the resentencing as to the determinate counts and the two 5-year prior serious felony enhancements each serious felony count; that a sentence of 45 years to life was imposed on counts 1, 2 and 4 (plus enhancements); and that a sentence of 25 years to life was imposed on counts 5-12, 18, 20 and 24 (plus enhancements). The superior court clerk is to deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P.J.

We concur:

BAKER, J.          KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37